[Civ. No. 5262. Second Appellate District, Division One.—April 11, 1928.]

CHARLES R. McCORMICK LUMBER CO. (a Corporation), Respondent, v. M. J. O'BRIEN, Defendant and Appellant; M. R. ESSERY, Defendant and Respondent.

W. C. Wilde for Appellant.

G. F. Hoff, and E. S. Torrance for Respondents.

WOOD (W. J.), J., *pro tem.*—Plaintiff alleges in the complaint that it sold and delivered certain building materials to defendants O'Brien and Essery at their instance and request and seeks to recover the sum of $530.32, the balance due on the purchase price. O'Brien was the owner of a house on which certain alterations were being made and

Essery was engaged to make the alterations under an agreement by which his compensation was to be calculated on the basis of ten per cent of the cost of labor and materials used in the work. The defendants answered separately, O'Brien claiming that Essery was an independent contractor and therefore solely liable, and Essery claiming that he was merely the agent of O'Brien. The trial court found in favor of the contentions of Essery and rendered judgment against O'Brien, who prosecutes this appeal.

Determination of the appeal depends upon the question whether the findings are supported by the evidence. Since the findings are in favor of plaintiff, the evidence must be considered in the light most favorable to its contentions. (*Hoppin* v. *Munsey*, 185 Cal. 678 [198 Pac. 398].) Nearly all of the evidence on the subject is found in the testimony of Essery and certain exhibits received by the court. Concerning the making of the contract, Essery testified: "I told him (O'Brien) the only way I would care to handle a job of that kind in the country, and an alteration job, would be on a percentage basis, which would be—I would act as his agent as superintendent, on the basis of 10% plus cost of the job, and settlement would have to be made every week, at any time he was dissatisfied with me, he could fire me. . . . Q. Then what did Mr. O'Brien say? A. All right. . . . Q. As to the general method of the doing of this construction work by you for Mr. O'Brien, the employment of all labor and the purchase of all necessary material was left with you to attend to, was it not? A. Practically—with his suggestions, of course. He made suggestions and I advised him. Always advised with him. Q. That is, he directed generally as to what he wanted done and what should be done; but as to the duties of procuring the necessary material and the duties of the necessary labor to carry it out, that was left with you? A. Yes, sir. . . . I drew a sketch of the plan that he wanted, and he kept changing it from time to time, adding to it and enlarging it. . . . I told him that I would handle the work, that the only way I could handle a job like that would be on what we call percentage plan, he to pay all bills and make a settlement each week and give me ten per cent of the cost for that week, each weekly statement, that I would handle the job on that basis. And he said that he did not want to bother writing out all these checks, and asked me if I

would do it. I told him if he would give me the money to pay the bills I wouldn't mind using my checks. I had a voucher check, and showed it to him. And he seemed to think it was a very good arrangement. He said it would please him better because he was very busy, give me one check a week instead of a number of checks. So that was arranged that way. . . . He said he . . . would pay all the bills and give me ten per cent for my trouble in looking after it 'and drawing the plans and furnishing carpenters, and so forth. . . . Mr. O'Brien bought some of the material himself personally.'' Concerning the ordering of the material from plaintiff, Essery testified: ''I hold Pearsall it was another percentage job; and just then Mr. Richardson, the bookkeeper, stepped up, he says, 'Who is O'Brien?' I told Mr. Richardson that he was a Canadian gentleman who had been spending his winter here for a number of years, and had rented a house from me once and paid the rent in advance, and had shown me his pass over a Canadian railroad issued to 'Senator M. J. O'Brien,' and admitted to me that was who he was. And Richardson said, 'All right, we'll send that out.' . . . Q. Just one moment. I desire particularly to call your attention to any conversation you had with him as to who you were representing in the matter, whether yourself individually or some other person. A. I don't think I told Mr. McDermott, but I told Mr. Richardson and Mr. Pearsall over the counter. Q. What did you say to them? A. I handed the order in and told them I had another percentage job here at Grossmont for M. J. O'Brien, and that I had spoken to McDermott about it, and that I had brought this order in for him. They said he was not in, but they would see he got it. Then Mr. Richardson come up and took the order and said, 'Who is O'Brien?' and then I told him, as previously stated, who O'Brien was. And Richardson said he would send it up. Yes, sir. 'All right, we'll send it up,' he said. I told him of course, he understood that O'Brien was to pay the bills, and he nodded and went back to his desk. That is all there was to it.'' Essery further testified that he was discharged by O'Brien before the work was finished. There was received in evidence a letter from O'Brien to Essery in which the writer states: ''I have in mind that you complained about not having been able to get labor to do the excavation up there, and I sent you some laborers that applied for work and that were not

engaged. These men are now working at Grossmont in the quarry there. They are good men and all think they should have been employed. I would like to know what was the reason they were not so employed when they were sent. Please be good enough to send me these details as asked for before Saturday. . . . '' Mr. O'Brien being ill, did not testify.

◼ Sufficient evidence appears in the foregoing to sustain the finding of the trial court that Essery was the agent of O'Brien rather than an independent contractor. ◼ It is well settled that one performing services for another is an employee if he does not have the *right to control the means* by which the services are rendered. (13 Cal. Jur. 1019.) In *Luckie* v. *Diamond Coal Co.*, 41 Cal. App. 468 [183 Pac. 178], it is stated: ''The accepted doctrine is that, where the essential object of the employment is the performance of work, the relation of master and servant does not exist unless the employer retains the right to direct the mode and manner in which the job shall be done; or, in other words, not only what shall be done, but how it shall be done.'' The *right to control* is the test rather than the actual exercise of control. (*Press Pub. Co.* v. *Industrial Acc. Com.*, 190 Cal. 114 [210 Pac. 820]; *Western Metal Supply Co.* v. *Pillsbury*, 172 Cal. 407 [Ann. Cas. 1917E, 390, 156 Pac. 491].)

◼ ''An independent contractor is one who, in rendering services, exercises an independent employment or occupation, and represents his employer only as to the results of his work, and not as to the means whereby it is to be accomplished. . . . The chief consideration which determines one to be an independent contractor is the fact that the employer has no right of control as to the mode of doing the work contracted for.'' (*Green* v. *Soule*, 145 Cal. 96 [78 Pac. 337].) In *Western Metal Supply Co.* v. *Pillsbury*, 172 Cal. 407 [Ann. Cas. 1917E, 390, 156 Pac. 491], it is said: ''The real test by which to determine whether a person is acting as the servant of another is to ascertain whether, at the time when the injury was inflicted, he was subject to such person's orders and control and was liable to be discharged for disobedience or misconduct.'' In *Press Pub. Co.* v. *Industrial Acc. Com.*, 190 Cal. 120 [210 Pac. 823], the court said: ''In the absence of any express terms affirming or negativing the power of control and direction, its existence must be determined from the reasonable inferences to be

drawn from all the circumstances surrounding and attending the making and execution of the contract considered in conjunction with the nature of the contract and the duties ordnarily to be performed thereunder.''

 One rendering services for another under the so-called percentage plan might or might not be an independent contractor, depending upon the circumstances of the individual case. In the case now before us there was no written contract and there is an ''absence of any express terms affirming or negativing the power of control and direction.'' It was therefore the duty of the trial court to draw reasonable inferences from the surrounding circumstances to determine who had the right to control the means of doing the work. (*Press Pub. Co.* v. *Industrial Acc. Com., supra.*) We find that O'Brien had the right to discharge Essery when he pleased and did in fact exercise this right. This is a ''strong circumstance tending to show the subserviency of the employee.'' (13 Cal. Jur., 1034.) We also find that O'Brien personally bought some of the material used in the work, an act entirely inconsistent with the claim that Essery was an independent contractor. From his letter to Essery it appears that O'Brien sent laborers to be employed on the job and demanded an explanation why they had not been put to work. A finding that Essery was an independent contractor would necessarily involve holding that O'Brien had no right to purchase any of the material and that Essery had the absolute right to determine where each article of the material used should be purchased. In view of all the circumstances, it cannot be said that the trial court was not justified in holding that Essery was the agent of O'Brien rather than an independent contractor.

Counsel have not called to our attention any California decision in which a percentage building contract is construed with reference to the liability of the owner for bills incurred by the builder. Decisions from several other states have been cited, but these do not conflict with the views herein expressed. The statements of facts in the decisions cited are either incomplete as to the terms of the contract or definitely show that the builders had the right to control the details of the work. The case of *Carleton* v. *Foundry & Machine Products Co.,* 199 Mich. 148 [19 A. L. R. 1141, 165 N. W. 816], relied upon by appellant, does not assist him, for the reason that Carleton, who did the work on a

percentage basis, had complete control of the details of the work. The court, quoting from an earlier Michigan decision, states: "We are of the opinion that the test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent."

The judgment is affirmed.

Houser, Acting P. J., and York, J., concurred.