(No. 20121.—

THE LUTHERAN HOSPITAL, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(ADELLA ELLINWOOD, Defendant in Error.)

*Opinion filed December 18, 1930—Rehearing denied Feb. 4, 1931.*

H. L. HOWARD, and WILLIAM GREENE, for plaintiff in error.

GEORGE C. WENGER, for defendant in error.

Mr. COMMISSIONER EDMUNDS reported this opinion:

Adella L. Ellinwood filed her petition before the Industrial Commission to recover compensation from the Lutheran Hospital for the death of her husband, Truman

J. Ellinwood. The arbitrator found that the relationship of employer and employee did not exist between the hospital and Ellinwood and that Mrs. Ellinwood was not entitled to compensation. Upon petition for review the Industrial Commission found that Ellinwood came to his death from an accidental injury which arose out of and in the course of his employment. The finding of the arbitrator was reversed and compensation was awarded in the sum of $4100. This award was confirmed by the circuit court of Rock Island county, and the hospital has sued out this writ of error for review of the record.

The hospital is a four-story structure to which heat is supplied from a boiler room located in a separate but adjacent building. There are two boilers in this room, also a water pump which supplies water to the boilers. The pipes which carry steam to the hospital building run through a tunnel connecting the two buildings. On Sunday morning, April 11, 1926, Ellinwood was found lying inside the east boiler, dead. A post mortem was performed. Three doctors testified that he came to his death from heart disease and two others testified that he died from electric shock and burns. No point is made as to the cause of death, but it is urged that the decision of the Industrial Commission is wrong, first, because the status of deceased was not that of an employee but of an independent contractor; and second, because deceased was not hired to work in the boiler and in going into it he was a mere volunteer.

Amelia Dahlgren testified that she had been superintendent of the hospital for twelve years; that she had control over the nurses, training school, domestic help, cooks, laundryman, fireman and extra help; that she was charged with the responsibility as to the heating of the plant; that the first work Ellinwood did at the hospital was in January, 1926; that she had the time statements submitted by Ellinwood; that he worked "occasional days" and was paid

"fifty-five cents an hour for the hours that he worked;" that prior to his death he had worked, all told, some fifty or sixty hours and that at the time of his death the hospital owed him for seven hours' previous work. In answer to the question as to how many hours a day he worked, she stated: "Well, it was just what he felt that he could put in, you see; I believe that statement shows one day he worked ten hours straight on the 23d day of January; at another time he probably worked ten and a little something hours." She testified that she did not know of her own knowledge how many hours a day he worked, "because our work was such·that we couldn't give any definite dates—he couldn't give any definite time." In answer to the question as to whether he himself determined what time he should work, witness stated: "Well, if he came and looked over the valves—looked over the valves—if he worked four hours or two hours we paid him for those hours that it took him to do the work." She testified that she felt free to call on him whenever they needed him; that she called him whenever they wanted him, and that when he got through "with the particular thing" he was finished. She was then asked to state how she employed him just previous to the accident. She replied: "Well, during the afternoon of April 10—Saturday afternoon of April 10—Mr. Hullman, our engineer and fireman—fireman, rather, and laundryman—came to the office and told me that he was having trouble with the pump. Being Saturday afternoon I did not know just what to do, because it is so hard to get anyone. Mr. Ellinwood ran through my mind immediately and I called him up—that is, I called up Mrs. Ellinwood and asked her if she knew how I could locate Mr. Ellinwood and advised her that I wanted Mr. Ellinwood to look at this pump that the fireman said was out of order, and she said the last she knew of him he was over at the Red Jacket, in Davenport, and she would try to get in touch with him. Well, we let it go, and that

day—quite a little later in the afternoon—I went down and told the fireman, Mr. Hullman, that I hadn't been able to locate Mr. Ellinwood but Mrs. Ellinwood was trying to get him and just as soon as she could locate him she would send him right over. Well, by that time the pump had sort of gone back into shape—was working all right—so I called Mrs. Ellinwood and told her that the pump seemed to be working all right now. But Mr. Ellinwood had not yet come home. She said, 'Well, shall I tell him?' I said, 'Tell him it seems to be working all right now,' and when he came she told him, and when he came up to the hospital I said to him, 'Well, I guess they have got things fixed up there, but I think, Mr. Ellinwood, you might just as well come down with me and see how things are. To-morrow is Sunday. I am just a little afraid to leave it for fear something might come up.' So we went on through the tunnel, and as we went through the tunnel we noticed several metal valves were leaking and the trap was leaking. Well, he said, if I liked he could give me some time the following week. He could give me whatever time was necessary. He would come over to the plant and see that those things were fixed up. We went on and I told Mr. Hullman—I was up on the platform—I told Mr. Hullman. He mentioned that the pump was working all right. Mr. Ellinwood did not go down to the pump at all. He said— he stood up on the platform and said, 'I am going to have a little time to-morrow; I am going to the Red Jacket people to work on a job.' He said he would be back and see Mr. Hullman. Mr. Ellinwood said he would run over, and if he—if there was anything that came up he would help him with it. That is the way we left it." She further testified that they did not go down-stairs at all and did not look at the boilers. On cross-examination she stated that the work Ellinwood did in January "was looking over some of the valves, and so forth, in connection with the plant in general;" that the second time he worked there was

in February, and what he was doing "was the same line of work;" that the third time he worked was something over a week before April 10 or 11, when he did "similar work;" that the next transaction was when she called up his house; that he came over that Saturday afternoon, although she had told Mrs. Ellinwood it was unnecessary, because he knew "that the pump was—had given a little trouble there before," and both had assumed it might get out of fix again; that nothing was said as to what work he was to do if he came back Sunday, the following day, "only that he was coming over to see if he couldn't give Mr. Hullman a little advice about a stoker boiler;" that she didn't know just what this stoker boiler was; that she expected him on Monday morning, when "he was to go over the valves that we had been looking at on Saturday;" that she did not know that he was going inside the east boiler on Sunday and did not know that anyone was going inside the boiler on Sunday; that he was an engineer and handled some work with the Coke-All Stoker Company, and that there had been some conversation between her and him about changing the hospital's hand-fired boiler into a stoker boiler at some future time.

A. O. Hullman testified that he tended the hospital boilers week days and on alternate Sundays; that the first time he saw Ellinwood at the hospital was Saturday afternoon—the day before he died; that the pump broke so witness couldn't get water into the boiler and he told Miss Dahlgren; that he was told Ellinwood was busy and couldn't come, so he went ahead and fixed it; that when he left at five o'clock Saturday afternoon Miss Dahlgren and Ellinwood were standing on the platform above the boiler room, talking; that he went back about eight o'clock Sunday morning and Ellinwood was coming up the steps leading from the boiler room; that Ellinwood asked witness for an extension wire to get a light into the boiler, and he gave it to him; that Ellinwood did some cement work that morn-

ing on the west boiler and did not finish it before asking for the extension wire; that the cement would not stick and Ellinwood said he did not have the right kind of cement; that after Ellinwood got through trying to make the cement stick he was fixing the door on the hind part of the east boiler but couldn't find the pipe-cutter to cut the pipes and then decided to go into the boiler; that Ellinwood got a hose in there and the light; that witness turned on the water and Ellinwood held the hose in one hand and the light in the other; that witness gave him a board to lie on; that after witness handed him the hose and light witness left and went outside to fix a truck. On cross-examination Hullman stated that Ellinwood was an engineer; that Sunday was witness' day off and he came back just to fix the truck; that only the west boiler was being fired that day; that the cracks which Ellinwood was trying to fix with concrete were on the outside; that Ellinwood brought the cement himself and made it there himself, and that several bricks were down on the east boiler, and in order to put them up one would have to be inside the boiler. Hullman also stated that he was not in charge there and did not direct "them" to do any work—"not at all." On re-direct examination he testified that he did not tell Ellinwood the boiler needed cleaning and that he supposed Ellinwood looked the boiler over himself.

The rule stated in *Decatur Railway Co.* v. *Industrial Board,* 276 Ill. 472, that the right to control the manner of doing the work is the principal consideration which determines whether the worker is an employee or an independent contractor has been announced and followed in a number of subsequent decisions. (*Meredosia Levee District* v. *Industrial Com.* 285 Ill. 68; *Bristol & Gale Co.* v. *Industrial Com.* 292 id. 16; *Best Manf. Co.* v. *Peoria Creamery Co.* 307 id. 238; *Nelson Bros. & Co.* v. *Industrial Com.* 330 id. 27; *Besse* v. *Industrial Com.* 336 id. 283.) One who contracts to do a specific piece of work

and hires and controls his assistants and executes the work entirely in accordance with his own ideas or with a plan previously given him by the person for whom the work is done, without being subject to the latter's orders in respect to the details of the work, is not a servant or employee but is an independent contractor. An independent contractor is one who renders service in the course of an occupation representing the will of the person for whom the work is done only as to the result of the work and not as to the means by which it is accomplished. *Besse* v. *Industrial Com. supra.*

As to when a workman ceases to be in performance of the duties for which he is hired and becomes a volunteer, the rule which we have laid down and followed is, that a volunteer is one who introduces himself into matters which do not concern him and does or undertakes something which he is not bound to do, which he has not been in the habit of doing with his employer's knowledge or consent, or which is not in pursuance of any interest of the master and which is undertaken in the absence of any peril requiring him to act as in an emergency. *Mepham & Co.* v. *Industrial Com.* 289 Ill. 484; *Dietzen Co.* v. *Industrial Board,* 279 id. 11; *Central Garage* v. *Industrial Com.* 286 id. 291.

In the light of these principles of law there is obvious merit in the contentions made by the hospital. The only definite showing as to what Ellinwood did upon the three occasions when he was summoned to the hospital prior to April 10 is that he worked over the valves. It may be fair to conclude that he had previously worked around the pump. There is no showing, however, that he had ever done any work at all around or in connection with the boilers. On April 10 he was called to repair the pump. It had been fixed before he arrived, but Miss Dahlgren told him she was afraid to leave it over Sunday for fear something might come up, so they went through the tunnel, where they saw that certain valves were leaking. It clearly appears that

the only understanding as to definite work to be performed thereafter was that Ellinwood was to come back Monday and fix the valves. Miss Dahlgren and Ellinwood did not even go around the boilers, and there is nothing whatever to indicate that anything was said as to repairing or cleaning them at any time. Without any apparent request from Miss Dahlgren Ellinwood said he was coming over the next morning to see Hullman and give the latter "some advice about a stoker boiler." Only one of the boilers was a stoker boiler. The next morning Ellinwood, without any order or suggestion from Hullman, who had no authority anyhow, went ahead making repairs to the west boiler with cement which he himself had brought, and also attempted to fix a door on the east boiler. Having requested Hullman to get him an extension cord, which was furnished, he took a hose in one hand and the light in the other and crawled into the boiler, with the apparent purpose of washing it. After turning on the water Hullman left. There being nothing to indicate that Ellinwood was engaged to repair or clean the boilers on any occasion or that he had previously done any work on them, or that there was any emergency requiring work on them the morning he came to his death, the conclusion which must be drawn is that he went outside the scope of his employment when he undertook to work on them. However, accepting for the moment counsel's contention that Miss Dahlgren's expressed concern was not over any particular detail but over the working of "the plant in general," and that Ellinwood was consequently within the scope of his employment when he undertook to repair and clean the boilers as an element of that "plant"— in other words, that his commission was to see to it that the "plant" was put in order to furnish heat—it immediately becomes evident that the manner in which the end was to be accomplished was to be left entirely with him and that the hospital retained no control over the details of procedure. Regardless of the point of view which may

be taken, we conclude that the evidence is insufficient to support the finding that deceased was an employee who came to his death from an accidental injury which arose out of and in the course of his employment.

The judgment of the circuit court is reversed and the award of the Industrial Commission is set aside.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment reversed and award set aside.*