[Civ. No. 525. Fourth Appellate District.—January 30, 1932.]

SAMUEL WEINBERG, Appellant, v. CLINTON L. CLARK et al., Respondents; CITY OF LOS ANGELES (a Municipal Corporation), Intervener.

Clyde C. Triplett for Appellant.

Harry D. Parker and Raymond G. Stansbury for Respondents.

BARNARD, P. J.—The plaintiff brought this action to recover damages for personal injuries sustained by him through being struck by an automobile while in the performance of his duties as a street sweeper in the City of Los Angeles. The City of Los Angeles intervened for the purpose of recovering certain moneys it had expended for compensation, medical bills and the like, and it was stipulated in open court that the intervener should be given a lien on any judgment in favor of the plaintiff for a named amount. The interest of the intervener need not be further referred to herein. The automobile which caused the injuries com-

plained of was owned by Clinton L. Clark and was being driven, at the time the injuries were sustained, by Willard Brown. This action was brought against both Clark and Brown as defendants, upon the theory that Brown was, at the time in question, the agent and employee of Clark. After a trial by the court without a jury, judgment was entered in favor of the plaintiff against Brown in the sum of $3,500, and that he recover nothing as against Clark. The plaintiff has appealed from that portion of the judgment in favor of Clark,.who will hereafter be referred to as the respondent. The court found "That the defendant Willard Brown was not at the time of said collision acting as the agent of the defendant Clinton L. Clark." While the sole question presented on this appeal is whether or not this finding is supported by the evidence, there are two phases of the problem which will be separately discussed.

The first question presented is as to the general relationship between these parties at the time, that is, whether the defendant was an employee or agent of the respondent or whether, as contended by the respondent, he was an independent contractor. It appears from the evidence that the respondent was engaged in the business of selling automobiles in the city of Los Angeles, having a place of business on Pico Street and a separate used car lot on Main Street. Brown testified that on the day of the collision here in question and for some time prior thereto, he was employed by Clark as an automobile salesman; that he represented Clark and sold used cars at the lot on Main Street; and that all of the cars he sold on those premises belonged to Clark. As to the beginning of their relationship, he testified as follows:

"Q. When you hired out, or accepted employment of Clinton L. Clark, did you have any conversation with Mr. Clark?

"A. I asked him for a position one evening and he said to come and see him the next morning. I called to see him the next morning and he said, 'Go down to the lot and see the sales manager.' I just cannot recall his name just now. He was on the lot when I got there and I talked to him a few minutes and he says, 'Go to work.'

"Q. Did you talk to him about the duties you were to perform?

"A. A used car man knows what he has to do. . . .

"Q. And your duties were to be confined to the managing and selling of automobiles on the lot?

"A. To sell automobiles at that address; yes, sir."

He further testified that during most of the time he was the only person in charge of the lot; that he was under a sales manager for Clark; that this sales manager "was not on the lot; he was out at the other address"; that he (Brown) usually came to the lot about 8 o'clock in the morning and "sometimes I stayed until 7 or 8 at night, and sometimes I closed a little earlier"; that there was no office on the lot, an automobile being used as an office; that he locked the gates at night and unlocked them in the morning; that he was the first representative of Clark to open the lot for business in the morning; that he spent all of the time during the day on the lot except when he had to demonstrate a car in order to sell it and except when he went to a restaurant next door to eat; that all of his duties were carried out on that particular lot between the hours above named; that he never received any instructions as to when he was to open or close the lot; that he was instructed to sell cars; that sometimes he drove cars down from the other place of business and sometimes this was done by other employees; that he performed no services for Clark at any other place than this lot; that he was responsible for the safekeeping and care of the cars; that during his spare time he kept the cars in a presentable condition and at times when he could not keep this done properly Clark sent a man down to clean cars; that Clark furnished the gasoline and oil for all of the cars on the lot; that sometimes these supplies were brought down by him and sometimes they were "sent over by some other employee"; that he never signed any contracts for the sale of cars except as a witness; that he took an application from a prospective purchaser, getting such facts as he could and accepted a down payment; that the sales were then submitted to Clark's main office for approval and any contracts were prepared there; that he was furnished prices for the cars and was not permitted to cut the price without first securing permission; and that he was paid once a month by check, receiving a commission of five per cent on the amount of the sales made. When asked if it was a part of his duties to

clean the cars, he replied: "That is the duty of any salesman to keep his stock clean." When asked whether instructions were given him concerning automobiles that were sent to the lot, he replied: "Well, the price of the car was sent down. I understood what to do with them. I understood my duties, you know, as a car salesman." On cross-examination Brown stated that the only duties he had to perform were to sell the cars that Clark delivered to him, at the prices Clark named. When asked if he was required to be at work at 8 o'clock in the morning, he replied: "Usually a salesman shows up at that time." He also testified that there were certain hours during the day that he was supposed to sell cars and that while Mr. Clark had never definitely told him to be there at 8 o'clock every morning, he testified: "I was always on time." He further testified that he never went over to the main place of business without having the sales manager come down and watch the lot. When asked if he had the privilege of spending an hour away from the lot on personal business, he replied: "I never tried it, I don't know whether I could or not, I never left Mr. Clark's lot except on business." He also testified: "I was told if I ever had an errand at Mr. Clark's place of business I could take one of the cars for that purpose. I had my own car for my own use." When asked if the sales manager supervised his employment on this lot, he replied: "Not to a great extent."

The rules of law applying to the question thus presented are summarized in *May* v. *Farrell,* 94 Cal. App. 703 [271 Pac. 789, 792], as follows:

"An independent contractor is one who in rendering service exercises an independent employment or occupation, and represents his employer only as to the results of his work and not as to the means whereby it is to be accomplished (*Green* v. *Soule,* 145 Cal. 96 [78 Pac. 337]; *Moody* v. *Industrial Acc. Com.,* 204 Cal. 668 [60 A. L. R. 299, 269 Pac. 542]); and when the essential object of the employment is the performance of the work the relation of master and servant does not exist unless the employer retains the right to direct the mode and manner in which the work shall be done (*Western Indemnity Co.* v. *Pillsbury,* 172 Cal. 807 [159 Pac. 721]). As was held in *Western Metal Supply Co.* v. *Pillsbury,* 172 Cal. 407 [Ann. Cas. 1917E, 390, 156 Pac. 491],

the real test is to ascertain whether the employee was subject to the employer's orders and control and was liable to be discharged for disobedience or misconduct; . . . "

The respondent relies particularly upon the case of *Barton* v. *Studebaker Corp.*, 46 Cal. App. 707 [189 Pac. 1025, 1028], in which it was held that an automobile salesman was an independent contractor rather than an employee even though he made his headquarters at the established place of business of his co-defendant, it being held that the necessary right of control over the mode and manner of accomplishing the work did not there appear. In that case the court said:

"The real test as to whether a person is an independent contractor or a servant is whether the person alleged to be the master, under his arrangement with the other party, has or has not any authoritative control of the latter with respect to the manner in which the details of the work are to be performed, and, therefore, this test or element 'must, in the last analysis always determine what was the essential nature of the relationship between the person who performed the given work and the person for whom it was performed'. (Labatt on Master and Servant, sec. 18, p. 26.)"

Applying these rules to the evidence in this case it seems to us that Brown must be held to have been an employee or agent of the respondent rather than an independent contractor. There is some evidence of an authoritative control by the respondent over the manner in which the work was to be performed and there is no substantial evidence to the contrary. Brown was not a "free lance" salesman, free to seek purchasers at any time and place he chose, and the respondent was interested not only in the results of particular sales, but in maintaining a definite instrumentality for the purpose of fostering sales and catering to a certain line of trade. There was little difference between the position of Brown and that of the ordinary salesman in a store, except for the one fact that he was compensated by a commission on sales and not by a salary. That fact is not controlling (*Brown* v. *Industrial Acc. Com.*, 174 Cal. 457 [163 Pac. 664]). Some actual control and a not inconsiderable right of control over the methods used by Brown, on the part of the respondent, here appear. His duties were confined to his used car lot and to things incidental thereto, and consisted of keeping his stock in condition to be shown, showing and

demonstrating cars to parties who came to the lot, and making such trips to the main office as would facilitate the performance of these duties. That the respondent interested himself in the means by which sales resulted is indicated by his furnishing gasoline and oil, instructing Brown to use any of the cars not only in demonstrations but in coming to the main office, furnished new batteries freely in order to promote sales, and sending other employees who changed tires and helped clean cars, athough Brown testified that he never requested such help. He testified that occasionally "someone was sent from the other place", that he could not say who sent them or "what they were sent for", but that "they changed a battery and wiped off a car a little or whatever I needed help at while they were there". He also testified that the occasions when the respondent sent a man down to clean cars were times when he was too busy to keep it done properly. It it also apparent that Brown's duties were confined to rather regular hours, which coincide very closely with usual business hours. He carried a key and opened the place in the morning and closed it at night. He testified that he was supposed to sell cars during certain hours of the day, and while he did say that he was not instructed to be there at 8 o'clock every morning, he testified that he fully understood the duties of such a salesman; that "usually a salesman shows up at that time"; that "I was always on time"; and that he had never tried to take an hour away from the lot on personal business. A recognition of the right of control over the hours worked, if not an actual control fully appears. Not only do the circumstances surrounding the beginning of Brown's employment further indicate a relationship as employee, but he testified that he was "under" a sales manager who supervised his employment, although "not to a great extent". ■ We take it that the true test is the right of another party to control the methods used, and not the extent of the control actually used. As was further said in *May* v. *Farrell*, *supra:* " . . . the fact that a certain amount of freedom of action is inherent in the nature of the work does not change the character of the employment where the employer has general supervision and control over it." As we view it, this record contains no evidence justifying the conclusion that the respondent retained no control over the methods

used by Brown in operating the used car lot and making sales therefrom. We therefore hold that he was not an independent contractor.

The next question presented is whether Brown was acting for his employer, within the scope of his employment, on the particular occasion here in question. In this regard the evidence shows that the collision happened about 9 o'clock in the morning, that he had taken one of the used cars on the lot and had gone to the main office "on an errand", and that at the time the accident occurred he was returning from the main office to the used car lot. He testified as follows:

"Q. Now, you say when you went on an errand for Mr. Clark you took any car that was on the lot? A. Yes, sir.

"Q. Now, the morning of this accident you were engaged in such an errand at that time, were you not, or returning from an errand? A. I had been to the main office on an errand. I could not tell you the nature of the errand now.

"Q. By 'the main office' you mean Clinton L. Clark's place of business on West Pico Street? A. Yes, sir.

"Q. You were returning from his place of business there to the used car lot? A. Yes, sir.

"Q. You do not recall the exact nature or purpose of the errand? A. No, I cannot.

"Q. But it was in connection with Clinton L. Clark's business? A. Every errand that I had out there was in connection with the selling of cars in some way or other excepting the last one, and that was the time I resigned.

"Q. By the Court: Mr. Brown, where had you been just before this accident occurred? A. I had been out to the main place of business, 2219, I think is the number, West Pico.

"Q. What had you gone there for? A. On some business errand; I could not tell you, I don't recall what it was. I assume to take some money that had been paid me on a down payment or weekly payment or something. It was in accordance with my business. I am sure of that because I never went out on pleasure during business hours."

The only rebuttal offered to this was the testimony of respondent's cashier to the effect that no money was turned in by Brown on the day in question. The undisputed evidence shows that Brown was specifically instructed to take a

car from the lot whenever he had an errand to the main office, and there is some evidence that at the time of the accident he was returning in such a car from an errand to the main office; in other words, that the accident occurred while he was carrying out instructions given him. It is argued that his statement that he had gone on an errand in connection with the business is simply his conclusion and not a statement of fact. This testimony contains an element of recollection and elements of fact which may not be disregarded simply because he was unable at the time of the trial to remember the particular detail of the business that called him to the main office. While not as strong as it might have been, his evidence is entitled to some weight and any possible weight is in favor of the proposition that he was acting within the scope of his employment. The evidence shows that he was an employee of the respondent; that he was during business hours proceeding from one to another of his employer's places of business; that he was using a car owned by the employer; and that he had his employer's consent to so use this car. An inference therefore arises that he was then acting for and on behalf of the respondent (*Rock* v. *Orlando*, 100 Cal. App. 498 [280 Pac. 377]). There is no evidence to the contrary and a conflict in the evidence is not presented. Under such circumstances, at least a *prima facie* case was made out and a finding that Brown was not acting within the scope of his employment at the time of the collision is not sustained. As now presented, we think the controlling question in this case is whether or not Brown was an independent contractor, and for the reasons above set forth we feel compelled to hold that the finding complained of is not sustained by the evidence.

While it satisfactorily appears that Brown was an employee of the respondent, the evidence in relation to whether or not he was at the time acting within the scope of his employment, while not sufficient to sustain a finding that he was not, is not so convincing to the effect that he was, as to necessitate a judgment against the respondent. Additional evidence on that point might be available. We therefore think the case should be sent back for a further hearing on that issue alone.

That portion of the judgment in favor of the respondent Clark is reversed with directions to the trial court to take

evidence upon the one question as to whether or not Brown was acting within the scope of his employment at the time of the collision, to make findings thereon, and to enter judgment in accordance with such findings and with the views herein expressed.

Marks, J., and Jennings, J., concurred.