[File No. 6310.]

JOSEPHINE IGNATOWITCH, Respondent, v. P. F. McLAUGHLIN, Montana-Dakota Power Company, a Corporation, and Montana-Dakota Utilities Company, a Corporation, Appellants.

(262 N. W. 352.)

Opinion filed August 16, 1935.   Rehearing denied September 18, 1935.

Simpson, Mackoff & Kellogg, for Respondent.

J. P. Cain, Durward E. Black, for Appellants, Montana-Dakota Power Company and Montana-Dakota Utilities Company.

J. W. Sturgeon, for Appellant, P. F. McLaughlin.

BURKE, Ch. J. This is an action for personal injury.

At the. close of plaintiff's case the defendants each moved for a directed verdict, which was overruled. At the close of the case the motion was renewed and overruled and a verdict was returned for the plaintiff against all the defendants. Thereafter a motion for judgment notwithstanding the verdict, or for a new trial, was overruled and from the order overruling such motion and from the judgment the defendants duly appeal.

Appellant claims that the court erred in overruling defendants' motion for judgment, in favor of the Montana-Dakota Power Company and the Montana-Dakota Utilities Company, made at the close of plaintiff's case, renewed at the close of the entire case and in overruling the motion for judgment notwithstanding the verdict on the ground and for the reason that the plaintiff wholly failed to establish, by competent evidence, that the defendant McLaughlin, at the time of the accident set forth in the complaint, was acting as agent, servant or employee of said defendants.

It is the contention of the respondent that, on the evening of the accident, the defendant McLaughlin made a trip to Gladstone, North Dakota for the purpose of renting an apartment from one John Loh and that he was engaged in the course of his employment and acting as the agent of the other defendants at the. time of the accident.

This contention is based on the evidence that the defendant McLaughlin had a desk in the office of the Montana-Dakota Power Company at Dickinson; that he usually drove his car in the morning and used it without objection in the city of Dickinson when seeing customers; that on the evening of the accident he made a trip to Gladstone to see one John Loh about renting an apartment in Dickinson and that while there he asked Mr. Loh if he was going to furnish a range with the

apartment; that he had been to see Mr. Loh on the Sunday previous and a range was also mentioned at that time and that he came back again after the accident and again mentioned the range. It is clear, however, from the testimony that Mr. McLaughlin's territory was confined to the city of Dickinson; that he furnished his own automobile, his own gas and oil and used it at times on trips to customers in the city; that he was paid a commission, based upon sales in the city of Dickinson; that the only instructions he had from the sales department were furnished in the price list, which he was required to observe in making sales. His time was his own. He could come and go as he pleased without restriction, except that he must observe the price lists in making sales. The manager in the office at Dickinson knew he had an automobile and was using it in the city of Dickinson without objection, but there is no evidence that the other defendants knew that the defendant McLaughlin was making the trip to Gladstone.

On the other hand, the evidence proves that the defendant McLaughlin, on the 20th of July, made the trip to Gladstone, not for the other defendants, but for himself, to rent an apartment in the city of Dickinson. McLaughlin so testified and the conversation he had with the Lohs on that occasion, as testified to by Mrs. Loh, shows that this trip was made to rent an apartment in Dickinson for the use of the defendant McLaughlin. It is true that he asked Loh if he would furnish a range and that McLaughlin testified that he wouldn't have considered a coal range; that he wanted to use gas, but he did not want this range for the other defendants; he wanted it for himself to use in the apartment and when Mr. Loh would not furnish the range the defendant McLaughlin furnished one himself for his use in the apartment and not for the use of the other defendants.

It is clear from this evidence that this trip to Gladstone was made by the defendant McLaughlin for his own purpose and that under his contract with the other defendants his activities in behalf of the other defendants were limited to the city of Dickinson. In going to Gladstone he was not acting in the course of his employment with the defendants, but was acting for himself.

A case very much in point is the case of State ex rel. J. A. Sexauer Mfg. Co. v. Grimm, 217 Wis. 422, 259 N. W. 262. In that case one

France, a salesman, was working under a similar contract and the court said: "Counsel seem agreed that the most potent factor in determining whether one is an independent contractor or an agent is where the control of the details of the work lies. Badger Furniture Co. v. Industrial Commission, 200 Wis. 127, 227 N. W. 288. From the above statement of .facts it appears that the control of the details is in France. The respondent, in opposition to this view, relies on a paragraph of the contract as follows: 'All details covering your work are to be under our direction. You are to make sales only upon prices and terms which we shall fix,' and urges that it is the right to control the details, rather than the exercise of the rights as matter of fact, that determines the matter of control, and cites the Badger Furniture Co. Case, supra, in support of its contention. This argument loses its force from the fact that the statement as to right of control is made in immediate connection with the control of prices and terms and should be limited to that, as it clearly appears both from the contract and the course of 'conduct that it was not intended to cover the details of France's traveling either as to how or where he should travel. The facts of this case make a clearer case of an independent contractor than those in the case of Kassela v. Hoseth, 217 Wis. 115, 258 N. W. 340. Under that case and the authorities cited in the opinion therein we hold that France was not an agent of the relator in respect to the operation of his automobile, but an independent contractor, if he can be considered as a 'contractor' in any sense in that regard. The term 'independent contractor' is perhaps a misnomer as so applied. It would be more exact to say that no contractual relations whatever existed between France and the relator as to the operation of the automobile. Whether France was a 'contractor' or not, his operation of the automobile was entirely 'independent' of the relator, and, this being so, the relator is not responsible for his conduct·in operating it."

This language is applicable to the facts in the instant case, for even assuming that McLaughlin went to Gladstone to sell a gas range to John Loh, his operation of the automobile on the trip was entirely independent of the other defendants. There was no contractual relation existing between them in relation to the operation of the automobile and

the other defendants cannot be held liable for an injury occasioned by its use.

In the instant case the defendant McLaughlin rendered service, limited to the city of Dickinson, in the course of an occupation representing the will of his employer as to the result of his work only and not as to the means by which it was to be accomplished and therefore was an independent contractor. Arne v. Western Silo Co. 214 Iowa, 511, 242 N. W. 539; Lumbermen's Reciprocal Asso. v. Carter (Tex. Civ. App.) 19 S. W. (2d) 346, 352; Preo v. Roed, 99 Cal. App. 372, 278 P. 928; Dillard v. Justus, 222 Mo. App. 362, 3 S. W. (2d) 392; Hutchinson-Moore Lumber Co. v. Pittman, 154 Miss. 1, 122 So. 191; Charles R. McCormick Lumber Co. v. O'Brien, 90 Cal. App. 776, 266 P. 594; Slyter v. Clinton Constr. Co. 107 Cal. App. 348, 290 P. 643; Besse v. Industrial Commission, 336 Ill. 283, 168 N. E. 368; Hartley v. Red Ball Transit Co. 344 Ill. 534, 176 N. E. 751; May v. Farrell, 94 Cal. App. 703, 271 P. 789; Lutheran Hospital v. Industrial Commission, 342 Ill. 325, 174 N. E. 381; Brigman v. Holt & Bowers (Tex. Civ. App.) 32 S. W. (2d) 220; Provensano v. Division of Industrial Accidents & Safety, 110 Cal. App. 239, 294 P. 71; Warren Webster & Co. v. Zac Smith Stationery Co. 222 Ala. 41, 130 So. 545; Weinberg v. Clark, 120 Cal. App. 362, 8 P. (2d) 164; Lewis Werner Sawmill Co. v. Northcutt, 161 Miss. 441, 134 So. 156; Brown v. Edwards, — La. App. —, 160 So. 173; Elrod v. Anchor Duck Mills, 50 Ga. App. 531, 179 S. E. 188; Crowe v. Peters, 171 Okla. 433, 43 P. (2d) 93.

It is clear from the record in this case that (1) the defendant McLaughlin was not operating as a salesman in the territory which entitled him to sell the other defendants' products under his contract at the time of the accident; (2) there was no contractual relation existing between McLaughlin and the other defendants as to the operation of the automobile; and, (3) when operating in the designated territory of Dickinson he was rendering services in the course of an occupation representing the will of his employers as to the results of his work only and not as to the means by which it was to be accomplished and, therefore, under the great weight of authority, was an independent contractor.

The motion for judgment by the defendants, Montana-Dakota Pow-

er Company and Montana-Dakota Utilities Company, should have been granted.

This leaves the question of the liability of the defendant McLaughlin.

The accident happened on highway number 10 on a high grade road, protected on each side by posts and cables. After the accident deceased was found near the 28th post on the north, or right, side of the road. Deceased and his son William were returning from a fishing trip and entered highway number 10 a mile, or a mile and a half, east of the point of the accident. The father was carrying three or four poles used in operating a fishing net. They were walking on the right side of the road, going west. East of the point of the accident and some distance east of the posts is a hill, from the top of which the point of the accident is clearly visible. Back from and near the top of the hill is a curve to the left, going northeast, and the point of accident was not visible while traveling around the curve until the car going west turned the curve near the top of the hill.

McLaughlin testified: "Left Gladstone at 8:15. It was dark and the lights of the car were on. My lights and brakes were in good working order. I had them adjusted about a month before. At one point I got vision of another car coming; just before I started down the hill I saw the reflection of a car. It had one light. As I straightened out in the road I slowed down my car, put on the brakes and took my foot off the gas. I slowed down to about twenty, or twenty-five miles per hour. The other car seemed to be coming at a moderate pace. It did kick up some dust and obstructed the view to some extent. I put on the dim lights and met this car, and we got by him and as I started to turn back into the road I saw a man about ten feet in front of me and tried to swerve to avoid hitting him. The dust from the other car had something to do with my vision. The glaring light from the other car and the dust made it hard to see. The man seemed to be about ten feet in front of me. My car was approximately six feet from (the edge of the road) the road when I saw the man in front of the radiator. I had been traveling about thirty-five miles per hour, but slowed down to twenty, or twenty-five, miles. I can't remember what I testified to at the coroner's inquest. The bumper, the right head light and the right fender hit the man. The car practically stopped

on the south side of the road. I shifted into intermediate, came back to the right side of the road, stopped, picked the man up and brought him to the hospital." His testimony is corroborated by the witness Birkmaier, who was riding with McLaughlin on the right side of the car. Birkmaier also testified that he noticed the boy walking north of the posts, outside of the posts and cables.

William Ignatowitch, ten years old, testified: "My father and I were walking on the right side of the Red Trail, going towards Dickinson. There were posts on both sides. I walked near the posts on the right side. My dad was inside along side of me on the left. I could reach him by the hand. I saw a car coming from Dickinson on the left side of the road. Two cars passed us. One had no lights and the other had lights on one side. It was getting night. There was a car that came from behind after the car with the one light passed. When the one light came, then Mr. McLaughlin came very soon after. My dad got hit by the car. We did not see the car that hit my dad.

"Q. Do you know whether your dad looked around as you were walking down for cars from behind?

"A. He did.

.    .    .    .

"Q. . . . when was the last time that your dad looked in the direction from where you were coming?

"A. When we reached these posts.

.    .    .    .

"Q. That was the last time that you saw your dad look around?

"A. Yes.

I looked around. We did not see any cars coming from behind. We kept on walking in the lane between the posts. Father hollered when he was hit. At the time the car backed up my dad was lying about this far from the posts. (Indicating.)

"Mr. Mackoff: What would your Honor's estimate be of the distance? . . .

"Q. Would you show how far again it was from the posts?

(Witness indicates.)

"The Court: A scant foot possibly.

"Mr. Cain: We object to the testimony elicited from this witness

by counsel in the manner of giving distances as incompetent, irrelevant and immaterial and invading the province of the jury in this case.

"The Court: Overruled."

William Ignatowitch continued: "I did say in Mr. Kellogg's office that he was in about five feet. I did not say in Mr. Kellogg's office that I was over on the other side of the posts. I did say I stepped over the cable or wire when I went to dad. That was after the accident I went to dad.

"Q. And then this one: 'How far on the north side of the posts did you walk?' Answer: 'Right by the posts.' Did you give that answer that day?

"A. Yes, sir.

"Q. And then this one: 'Were you on the north side of the posts when you saw this car up on the hill or did you get over there after you saw the car?' And did you give this answer to that question: 'I was walking on that side. The car wasn't up the hill yet.' Did you give that answer to that question?

"A. No.

"Q. And the next question: 'It wasn't up the hill?' and this answer: 'Yes.'

"A. No.

"Q. And then this next one, 'You were walking on the north side of the wire?' And your answer: 'Yes.' Was that question asked and did you give that answer?

"A. No.

"Q. And wasn't this question asked: 'You didn't say anything?' Answer: 'No. He told me that I should watch out so the car don't bump me.'

"A. No.

"Q. 'He was walking close to the edge.' Did you give that answer to that question?

"A. I cannot understand."

By stipulation, for the purpose of impeaching the witness William Ignatowitch his testimony given at the coroner's inquest, as follows, was admitted:

"Q. Did very many cars come from Dickinson towards you?

"A. I don't know. I guess one.

"Q. How about the ones coming from this direction, you couldn't see them so good, could you?

"A. Yes, I could.

"Q. How could you tell when they were coming?

"A. By the lights. We turned around every time.

"Q. Where were you walking at the time of the accident?

"A. About them posts. There is a hill going down and up and my dad was walking about here. (Indicating.)

"Q. Your dad was walking about in here?

"A. But the posts was up here and I was walking on this side of the posts and he was on that side.

"Q. Why were you walking over on this side?

"A. So I don't get a bump.

"Q. You thought you might get bumped?

"A. Yes.

"Q. That is where he was when the accident happened?

"A. He was about five feet.

"Q. The car carried him quite a ways?

"A. I don't think it carried him. It just hit him. It would have carried him on the front.

"Q. How did he carry them, (meaning the poles) over his shoulder?

"A. When the car came by he had them up.

"Q. Did he carry them like this? (Indicating.)

"A. When the car came he was holding them straight up.

"Q. Right straight up?

"A. Yes, sir.

"Q. You never saw the car behind you until it hit your dad?

"A. No; I saw it on the hill.

"Q. Did you see it on the hill?

"A. Yes.

"Q. You know there were posts along the road there where they had the accident?

"A. Yes.

"Q. You told Mr. Kellogg you were over on this side of the posts?

"A. Yes.

"Q. Did you have to step over the cable or wire?

"A. Yes. Then I went to get dad.

"Q. That was after the accident that you went to your dad?

"A. Yes, sir.

"Q. How far on the north side of the posts did you walk?

"A. Right by the posts.

"Q. Had you been walking out there for some time before the accident?

. (No answer.)

"Q. Were you on the north side of the posts when you saw this car up on the hill or did you get over there after you saw the car?

"A. I was walking on that side. The car wasn't up the hill yet.

"Q. It wasn't up the hill?

"A. Yes.

"Q. You were walking on the north side of the wire?

"A. Yes.

"Q. Why did you walk up there?

"A. I don't know."

It is conceded that this testimony was given at the inquest by William Ignatowitch the next day after the accident and it also appears from the testimony of Dr. Perkins that, in a conversation with his brother in the presence of others, William Ignatowitch made similar statements as to where they were walking and where his father walked at the time of and before the accident and it is the contention of the defendant that the statements made by the witness to his brother on the evening of the accident and the statement made the next day at the coroner's inquest are true; that they were made at a time when the facts were fresh in the mind of the witness and there was no reason, or cause, for his testifying to anything but the truth and that the testimony given at the trial was incredible and if ignored the true testimony as given at the inquest and as stated in the presence of Dr. Perkins and others shows that the negligence of the deceased was the proximate cause of the accident.

The credibility of the witness, however, was a question for the jury. They were fully instructed on the law of the credibility of a witness and were finally told "If you find that any witness has wilfully and

deliberately testified falsely as to any material fact or matter in this case then you are at liberty to disregard the whole or any part of the testimony of such witness, except in so far as it is corroborated by other credible evidence in the case."

Appellant claims that the court erred in giving the following instruction: "If you find from the evidence that the defendant, P. F. McLaughlin, was blinded by the car coming from the east (west) and then was enveloped by a cloud of dust that he should have foreseen, then I charge you that it was his duty to exercise great caution until vision could be restored, and that it would be negligence on his part to drive his car so fast that he could not stop within the distance that he could see."

This instruction is the so-called "rule of safety." As stated in Berry on Automobiles: "It has been held to be negligence for the driver of an automobile to drive on a highway at night at such a rate of speed that he cannot stop in time to avoid objects after they have come within the area lighted by his lamps." 1 Berry, § 186; Bagan v. Bitterman, 65 N. D. 423, 259 N. W. 266; Haines v. Carroll, 126 Kan. 408, 267 P. 986; Holsaple v. Menominee, 232 Mich. 603, 206 N. W. 529; Pietraszewski v. American R. Exp. Co. 122 Misc. 98, 202 N. Y. S. 262; Grosz v. Bone, 48 S. D. 65, 201 N. W. 871; O'Brien v. Alston, 61 Utah, 368, 213 P. 791; Lauson v. Fond du Lac, 141 Wis. 57, 123 N. W. 629, 25 L.R.A.(N.S.) 40, 135 Am. St. Rep. 30. It is doubtful if this instruction applies to the facts in this case, but it is a rule of law that is not prejudicial to the defendant.

Appellant claims that the court erred in its instructions on contributory negligence and in failing to give instructions requested. He claims that contributory negligence is properly defined in the instructions, but that nowhere do the instructions tell the jury the effect of contributory negligence upon the part of the plaintiff. .

The instructions on contributory negligence are as follows, to-wit: "Now, you will remember that the defendants contend that Ben Ignatowitch himself was negligent and that such negligence contributed to the cause of his death, and that such negligence was a proximate cause of the injuries from which he died. The burden of proving contributory negligence, as such negligence is known, is upon the defend-

ants to establish the same by a fair preponderance of the evidence. The fact or facts constituting such contributory negligence must be established by a fair preponderance of the evidence, and that the negligence, if any, of the said Ben Ignatowitch contributed in some degree, even though slight, as a proximate cause of the injury causing the death of the said Ben Ignatowitch, that is to say, the want of such care and caution as an ordinarily prudent and careful person would have exercised under the same or similar circumstances, which either of itself or concurring with the negligence of the defendant, P. F. McLaughlin, if any, proximately caused the injury from which Ben Ignatowitch died." This paragraph defines contributory negligence, but does not explain to the jury the effect of contributory negligence on the part of the plaintiff.

The instruction continues: "You are instructed that a pedestrian, equally with the operator of an automobile, has the right to be on and to use the traveled portion of a highway. The statute does not specify any particular part of the traveled way upon which a pedestrian must walk, nor does it specify on which side of him an automobile overtaking him must pass; nor does the statute require him to get out of the traveled way for an automobile overtaking him. The pedestrian is required at all times to exercise ordinary care for his own safety. A pedestrian walking along the traveled portion of a highway may assume that the driver of an automobile approaching him from the rear will not violate the law, and will exercise ordinary care in keeping a lookout for him. But this does not absolve the pedestrian from the duty to keep a reasonable lookout for vehicles approaching from the rear, as well as from the front, and to exercise ordinary care for his own safety. On the contrary, such pedestrian must exercise the degree of care for his own safety which an ordinarily careful and prudent man would exercise under like or similar circumstances." This instruction was instruction 12, which was construed with approval in the case of Kessel v. Hunt, 215 Iowa, 117, 244 N. W. 714. It is a general statement of the law applicable to every pedestrian on the highway and does not say what the effect of contributory negligence on the part of Ben Ignatowitch would be in case the jury found he was guilty of contributory negligence.

The instructions continue as follows: "If you find that the plaintiff's husband, Ben Ignatowitch, did not exercise ordinary care in walking upon the highway and did not keep a reasonable lookout for vehicles approaching from the rear and exercised ordinary care for his own safety as an ordinarily prudent man under the same circumstances would have done, and his failure so to do at the time of the accident may properly be said to have been a proximate cause of the injuries which caused his death or, whether, notwithstanding his lack of ordinary care, the injury would not have occurred but for the neglect of some duty owing to him by the defendant at the time, the neglect of which under the circumstances is considered in law as the proximate cause of the injury and death of Ben Ignatowitch, then you will find a verdict for the defendants." The latter part of this paragraph, namely: "or, whether, notwithstanding his lack of ordinary care, the injury would not have occurred but for the neglect of some duty owing to him by the defendant at the time, the neglect of which under the circumstances is considered in law as the proximate cause of the injury and death of Ben Ignatowitch, then you will find a verdict for the defendants," is the only place in the instructions, on contributory negligence, where the jury were told that they may find a verdict for the defendants and it would seem, under this instruction, that it would be first necessary for the jury to find a lack of ordinary care on the part of Ignatowitch and then find some duty which the defendant owed to Ignatowitch at the time, which he had neglected to perform and then it was incumbent upon the jury to say whether the neglect of such duty, under the circumstances, is considered in law as the proximate cause of the injury and death of Ben Ignatowitch and after finding that there was a lack of ordinary care on the part of Ignatowitch and that there was neglect of some duty, which the defendant owed to Ignatowitch at the time of the accident, which under the circumstances is considered in law as the proximate cause of the injury and death of Ignatowitch, the jury might find a verdict for the defendants. This portion of the instruction is difficult to understand. It permits the jury to speculate on what duty the defendant owed the plaintiff at the time and required the jury to pass on the question of law, viz.: whether the neglect of such duty was considered in law the proximate cause of the injury.

The defendant was entitled to an instruction explaining to the jury the effect of contributory negligence on the part of the plaintiff and the requested instruction, namely: "The law places upon all persons the duty of exercising reasonable care to avoid injury and even though you, as a jury, should believe from the evidence that the Defendant was negligent and the Plaintiff's husband sustained injuries and died therefrom, if the evidence also shows that the injury could have been avoided by the exercise of ordinary care on the part of the Plaintiff's husband and that he did not exercise such care, you should find a verdict for all of the Defendants."

This requested instruction would have made clear the effect of the plaintiff's contributory negligence on his right to recover. See, Clark v. Feldman, 57 N. D. 741, 224 N. W. 167.

It is claimed that the court erred in refusing to grant the following instruction, namely, "You are instructed that the driver of an automobile on a public highway has a right to assume that pedestrians traveling on said road will observe due care to discover approaching automobiles and he may rely upon this assumption until he discovers that this is contrary to the actual facts." The rights of the pedestrians and a driver of a motor vehicle are reciprocal, except that the law requires the driver of an automobile to drive on the right side of the road; while the pedestrian may walk upon any part of the road, but if he walks upon the right side of the road, ordinary care requires a higher degree of care than is required when the pedestrian walks on the left side, facing the traffic.

The law is well stated in the case of Kessel v. Hunt, 215 Iowa, 117, 244 N. W. 714, namely: "It is quite universally accepted at the present date that the left side of the street is the safer side for a pedestrian. By putting himself close to the left edge of the pavement the pedestrian faces all traffic without the inconvenience of looking around. Nevertheless the pedestrian is not bound to adopt such a course. He may walk on the right side, if he will. His duty, on whichever side of the street he walks, is to use ordinary care in the situation in which he puts himself and under all the circumstances surrounding him. 'Ordinary care' is the legal standard. But we have also held that the degree of caution which constitutes ordinary care varies with the circumstan-

ces; that the greater the apparent danger, the greater the degree of caution, which constitutes ordinary care. In other words, 'ordinary care' may expand or contract according to the circumstances in which the actor finds himself."

The court, in the instant case, instructed the jury that a "pedestrian walking along the traveled portion of a highway may assume that the driver of an automobile approaching him from the rear will not violate the law, and will exercise ordinary care in keeping a lookout for him," and since the rights of the pedestrian and the automobile driver in such circumstances are reciprocal, it was only fair that the instruction requested should have been given.

When the boy, William Ignatowitch, was giving his testimony relating to the place where his father was lying, after the accident, he said: "He was lying right by the posts about this far from the posts. (Indicating.)

"Mr. Mackoff: What would your Honor's estimate be of the distance? . . .

"The Court: A scant foot possibly."

It is claimed that this was error in invading the province of the jury. It was a question, of course, for the jury, but we do not see how it was prejudicial. Presumably the boy was testifying and indicating the distance in the presence of the jury and presumably the jury was watching the boy and the distance he indicated, as well as the court. Besides, the position was not very material. It is undisputed that Ignatowitch was struck by the right light, the right end of the bumper and the right end of the fender. He was not run over. The boy testified that he was not carried on the hood; and he must have been thrown some distance by the force of the impact. While the court should not have been asked to make an estimate and no estimate should have been given, it was not prejudicial.

Appellant claims that the plaintiff cannot recover unless two conditions concur, namely: negligence of the defendant, and freedom of the plaintiff from contributory fault.

The majority rule, as given in 2 Jones on Evidence, § 523, page 949, is as follows: "The great weight of authority, as well as the reason of

the law, favors the rule which imposes the burden of proof upon the defendant to establish plaintiff's contributory negligence."

In the case of Carr & Erickson v. Minneapolis, St. P. & S. Ste. M. R. Co. 16 N. D. 218, 112 N. W. 972, this court held that contributory negligence is a matter of defense and should be pleaded. In this case it was held that the plaintiff was not entitled to an instruction on contributory·negligence for the reason that contributory negligence was not pleaded as a defense.

In the case of Welch v. Fargo & M. Street R. Co. 24 N. D. 463, at page 486, 140 N. W. 680, it is stated that contributory negligence is an affirmative defense to be alleged and proved by the defendant. In this jurisdiction contributory negligence is an affirmative defense that must be alleged and proved by the defendant.

The judgment, as against the Montana-Dakota Power Company and Montana-Dakota Utilities Company, is reversed, set aside and the case as to such defendants is dismissed; but as to the defendant McLaughlin the order and judgment is reversed and a new trial is ordered.

Morris, Burr, Christianson and Nuessle, JJ., concur.

Burke, Ch. J. In a petition for rehearing objection is made to the emphasized part of the sentence on the first page of the opinion as follows: *"It is the contention of the respondent that, on the evening of the accident, the defendant McLaughlin made a trip to Gladstone, North Dakota for the purpose of renting an apartment from one John Loh and that he was engaged in the course of his employment and acting as the agent of the other defendants at the time of the accident."* The italicized portion of the sentence is inaccurate. It is not the contention of the respondent that the defendant McLaughlin made the trip to Gladstone for the purpose of renting an apartment. It is his contention that he went there on the night of the accident to sell Loh a gas range, but this contention is not borne out by the record. The whole sentence does give the contention of the respondent and follows with a statement of the evidence upon which the respondent bases his claim, viz.: that at the time of the accident McLaughlin had a desk in the office of the Montana-Dakota Power Company at Dickinson; that he usually drove his car in the morning and used it without ob-

jection in the city of Dickinson when seeing customers; that on the evening of the accident he made a trip to Gladstone to see one John Loh about renting an apartment in Dickinson and while there he asked Mr. Loh if he was going to furnish a range for the apartment; that he had been to see Mr. Loh on the Sunday previous and a range was also mentioned at that time and he came back again after the accident and again mentioned the range. Clearly there is nothing prejudicial in this statement and whether it is the contention of the respondent or not it is borne out by the testimony.

The testimony relating to the gas range was brought out by plaintiff's counsel asking Mrs. Loh leading questions about the range on the evening of the 20th, and on cross examination Mrs. Loh testified as follows: "There wasn't much said the first time he came down there. We said it was all right he could have the house. We said we would like to clean up the house a little bit. We said we wanted to paint the bathroom and kitchen just as soon as Dommes move out.

"Q. Where were you when this conversation was held? . . .

"A. In Gladstone. . . .

"Q. Who was there?

"A. My daughter and my husband and Reuters. . . . That was on the 20th of July.

"Q. He was talking about renting the house?

"A. Yes.

"Q. He wanted to know if Domme was going to move out?

"A. Yes.

"Q. And he said if he was he wanted to rent it?

"A. Yes.

"Q. Now, what else was said at that time, that night of the 20th of July?

"A. Well, he wanted to know if there is a stove, if we furnished a stove. . . . Then I said I hate to furnish a stove, they cost so much when you buy them and you lose so much money when you sell them.

"Q. You wouldn't get as much out of the old stove?

"A. Yes. . . . He wanted to know if I furnish the bedclothing and dishes.

"I said 'No, everything else was furnished.' Most of the talking

was done by my husband and Mr. McLaughlin. Mr. McLaughlin said he would like to know what was going to be left in the house in the way of furnishings and my husband said 'Everything except silverware, linen, bedding and a range.' My husband said 'Will you be willing to take your turn looking after the furnace there?' Mr. McLaughlin said he would. He wasn't there very long that night. We had some company. Mr. McLaughlin said he would be willing to take a turn looking after the furnace and my husband said, 'I might make a change, perhaps I'll put in a thermostat. That would make it easier for you people there.' He asked Mr. McLaughlin what the price of a thermostat was and Mr. McLaughlin said 'I did not come here to sell you anything. I do not want you to feel that way, that I came down to sell you some stuff. I do not know what the price is. We will talk about that later on.' He said 'I am leaving Saturday for my wife and children.' "

The testimony is not disputed, but is corroborated by Mr. McLaughlin, and the contention of the respondent that McLaughlin did not go to Gladstone on the evening of the 20th of July to rent an apartment is not supported by the testimony. The deal was not completed on Sunday, the 15th of July, and all of the testimony relating to the furnishing of the apartment was a part of the deal between the landlord and tenant.

The claim is also made in said petition that the testimony of Mr. Christopher, manager at Dickinson, and Mr. Trimble, general manager for the district, is in effect that Mr. McLaughlin is accountable like any other employee to Mr. Christopher, as the manager of that office.

Mr. Christopher testified that the sales manager sends out certain material with reference to the sales department, such as the price fixed for the articles to be sold, etc. "I am the manager of what we call the Dickinson district. Mr. McLaughlin is in Dickinson itself. Mr. McLaughlin works under the sales manager. I have in mind this general price list and that constitutes the main instructions.

"Q. And what hours did he (McLaughlin) work in the office, or didn't he have any hours?

"A. He didn't have any.

"Q. He didn't have any hours?

"A. No.

. . .

"Q. You mean that he could do just as he pleased in selling this merchandise that was to go into his territory?

"A. Yes, sir; he selected his own prospects.

"Q. That is true with reference to the stuff that went into Dickinson, that is his territory, is it not?

"A. Yes, sir.

"Q. And he could use his own judgment about the solicitation for any of this merchandise that would go, or equipment, into Dickinson?

"A. As to where he went?

"Q. As to the merchandise, as to the prospects.

"A. Yes."

Mr. Trimble testified: "The arrangement with the salesmen is that they are given list prices, are paid a straight commission, are responsible as to their work to the general sales manager in Minneapolis. . . . The manner is simply for the salesman to go out and sell the merchandise at any time. He is at liberty to make appointments at any time of the day or evening. The method of selling is purely his own resources, and his living and commission depend on his ability to sell and how hard he works at it."

From this testimony the only instruction given to the salesmen is the price list. The company does not attempt to direct him in any way. He is responsible to the sales manager for the cost price of the article. His manner of making sales are left to his judgment and he is responsible only for results. Besides his territory is limited to Dickinson. Gladstone was not in his territory and there is not one word of testimony that the other defendants had any knowledge of his trips to Gladstone.

"In order to hold an employer liable for injury caused by the negligence of a salesman while driving his own automobile, the relation of master and servant must exist, and he must, at the time, have been acting within the scope of his employment in performing an act for his employer's benefit. It must also appear that the automobile was used

in the employer's business with his knowledge and assent, and under his direction and control." 7–8 Huddy, Auto. p. 350, § 183.

The petition for rehearing is denied.

NUESSLE, MORRIS, BURR and CHRISTIANSON, JJ., concur.