AMERICAN NATIONAL INSURANCE COMPANY
v. E. J. DENKE ET AL.
No. 6703.

AMERICAN NATIONAL INSURANCE COMPANY
v. H. L. SHEPHERD ET AL.

No. 7050.   Decided June 17, 1936.
Rehearing overruled November 12, 1936.
(95 S. W., 2d Series, 370.)

*Frank S. Anderson,* of Galveston, *Williams, Lee, Sears & Kennerly, S. R. Fisher* and *W. H. Blades,* all of Houston, for plaintiffs in error.

Where the employer is sought to be held for the act of an employee, it must be shown, first that the relationship of master and servant existed between the employer and employee and where the evidence shows that one was employed by the defendant to solicit insurance on a commission basis, the defendant reserving no right of control over the ways, means and details of how the soliciting was to be done, and did not furnish the solicitor with an automobile, or authorize or request him to use one, the solicitor occupies either the relationship of agent, for whose physical acts his employer or principal is not bound, or in the relation of an independent contractor, for whose act his employer is not liable. Fowler v. Maytag Southwestern Co., 82 S. W. (2d) 699; Cunningham v. International & G. N. Ry. Co., 51 Texas, 503; King v. Galloway, 284 S. W., 942; 23 Texas Jur., 552.

*King, Wood & Morrow* and *H. Earl Cox,* all of Houston, for defendant in error.

The evidence showing that the insurance company did exercise control over the solicitor while performing his duties under the contract of employment, constituted the solicitor an employee and not an independent contractor. Cockran v. Rice, 128 N. W., 583; McElwrath v. Dixon, 49 S. W. (2d) 995; Gulf Refining Co. v. Rogers, 57 S. W., 183; Aetna Life Ins. Co. v. Culvahouse, 10 S. W. (2d) 803.

MR. JUDGE GERMAN delivered the opinion of the Commission of Appeals, Section A.

These are companion cases. They grew out of the same accident and the controlling facts, so far as the question of liability of plaintiff in error is concerned, are identical. Both cases arose out of an accident in the City of Galveston on January 22, 1932. An autombile operated by one W. W. Saunders and owned by his wife was driven against Gerald Denke and against Jesse Foster Shepherd, causing serious personal injuries to each of them, and these suits followed. They were brought by the proper parties and in the proper manner. Judgments in favor of plaintiffs in each case for large sums of money were rendered in the district court. Both judgments were affirmed by the Courts of Civil Appeals. An opinion in the Denke case is reported in 65 S. W. (2d) 522, and in the Shepherd case in 91 S. W. (2d) 439. All questions of negligence have been eliminated from the cases, and we have here for decision the sole question of whether or not at the time of the accident W. W. Saunders was acting in the capacity of a servant or employee of plaintiff in error, American National Insurance Company.

For the purposes of this decision, we adopt the statement of the material facts made by the Court of Civil Appeals in the Denke case:

"The evidence establishes that at the time of the accident the appellant was engaged in writing industrial insurance, with premiums payable weekly, and also regular old line insurance. It had in its employment about twenty-five or thirty agents who were engaged principally in soliciting new insurance and collecting premiums on old policies. Saunders was one of such agents. For its purpose, the appellant had divided the city of Galveston into various blocks or territory called 'debits,' and each of such agents was assigned to a 'debit.' Such agent was required to spend the first three days of each week in collecting the weekly premiums due on policies in his 'debit' and in locating prospects for new insurance. The remainder of the week was devoted to writing new policies. Saunders was under a written contract with the appellant by which he agreed, in part, as follows:

" '1. In consideration of my appointment as an agent of the American National Insurance Company, I hereby agree as follows:

" '2. To solicit new insurance and to collect premiums regularly every week. To obey the orders and to carry out the

instructions of the company, and to use my best efforts to further its success.

" '3.  To keep true accounts of the business in such books as may be furnished by the company, and to remit to the Home Office, every week, at the time required, and on the form furnished by the company, a true account of all money received by me, with the cash received by me during each week, less authorized deductions.

" '4.  To pay all charges incident to sending moneys and parcels, postage, license or bond fees, and all other charges necessary to carry on the business of my agency, and I agree that out of any salary that may become due me the company shall first reimburse itself for any cost it may incur in furnishing me with a certificate of authority, license or other expense necessary to qualify me as agent, as imposed by the requirements of the State, County, City or Town in which I am to work.

" '5.  To forward no applications except upon lives personally seen by me at the time the application is made, and believed by me to be in sound health.

" '6.  To send to the Home Office each week with my account on the proper form a list of all policies upon which four weeks' premiums are due at the time of making up my account. * * *

" '9.  To comply in all respects with the instructions and rules from time to time issued by the Company. * * *'

"Said contract further provided that 'the agent will be paid a salary as follows: "Fifteen per cent of the amount collected each week on debit." ' In addition, the agent was allowed certain commissions on all new policies written by him and certain other commissions on the net increase of business in his debit.  The commissions due him were not retained by him out of collections made, but all such collections were turned into the company, and the agent was paid the amount due him on each Saturday.  The contract required him to account to the company on Monday of each week for all sums collected, but the company reserved the right to demand an accounting on any other day and as often as desired.  The company could discharge him at will without notice.  There was evidence to the effect that such agents were required to distribute literature in their territory advertising the business of the company.  They were required to report to the office of the company at 7:30 each morning for the purpose of receiving a list of the premiums to be collected and instructions with reference to

their work. They were divided into groups of six or seven each, and each group was under the supervision of an assistant superintendent. At these meetings, called 'staff meetings,' the superintendent first gave general instructions, and then each assistant superintendent gave more definite instructions to his group with reference to how to collect the premiums and write new insurance. If an agent reported that he had failed to make certain collections, the assistant superintendent would give directions as to how to make the collection. Each agent was given a list of the premiums to be collected, together with the route to be followed or the order in which the debtors were to be called upon. Thursday, Friday, and Saturday of each week was devoted to writing new insurance. On these days, after attending the 'staff meeting' in the morning, the agent went to work at 8 a. m., and worked until 11 a. m., and began work again at 1 or 1:30 in the afternoon and worked until 4 or 5 o'clock. He was required to attend another 'staff meeting' at the office at 5:30 p. m., at which time he reported what success he had had during the day and his reasons for not writing more insurance. One of the agents testified that at such meeting 'the assistant superintendent usually asked us how much we had written today and why we didn't write some more and how did we happen to fall down and how many calls we were going to make that night. He did not always ask why we had fallen down in those words, but more or less to that effect. Once or twice he had a nice word for you. If you really wrote some business they would kind of smile. If you went out and didn't write it they would smile but there was a sort of a hard line around that smile.' After receiving such instructions at the evening 'staff meetings' and after eating their dinners, the agents were required to return to the field of their work and solicit insurance for a few hours each night. Sometimes the assistant superintendent would require them to work in groups of twos or threes or in such other manner as he saw fit. Sometimes a more experienced agent was required to work with a less experienced one for the purpose of giving instructions to the new agent.

"The accident in question occurred on Friday afternoon. On the morning of that day Saunders attended the usual 'staff meeting' at 7:30, and in compliance with instructions from his assistant superintendent he spent the remainder of the morning until 11 a. m. soliciting insurance with a new agent named Johnson in Johnson's 'debit.' About 11 o'clock he separated from Johnson and went to solicit prospects in his own terri-

tory. That afternoon, after soliciting prospects in his own territory until about 4 p. m., he started in an automobile to another part of the city to a territory usually worked by another agent named Kries. It appears that Kries was a new agent, and that Saunders had been required to work with him in Kries' territory a few days prior thereto, and while so working Saunders had secured the names of some prospects. While on his way from his home to visit these prospects in Kries' territory for the purpose of selling them some insurance, he ran the automobile in which he was riding over Gerald Denke, inflicting the injury above indicated. The appellant did not furnish Saunders an automobile to use in the business, nor require him to use an automobile, but the evidence shows that Saunders did frequently use his wife's automobile for that purpose, with the knowledge and acquiescence of the appellant. He was so using his wife's automobile at the time of the accident."

We may add, however, that plaintiff in error seriously questions the statement that Saunders had frequently used his wife's automobile "with the knowledge and acquiescence of the appellant;" and may further add that there was nothing in the contract, either actually, or as construed by the parties, which in any way sought to control Saunders in his physical movements while doing his work, or directing that he should or should not travel by automobile, street car, cab, or on foot or otherwise.

The importance of the question decided in these cases has not been minimized. Counsel for all parties have furnished the court with comprehensive and able briefs. In addition to considering the authorities cited, we have given the matter a most thorough independent investigation. The conclusion which we have reached is the result of this mature and exhaustive consideration of the question.

■ Without undertaking to comment upon the various terms of the written contract between the Insurance Company and Saunders, we think we may safely and confidently say that it is undoubtedly one of agency. Eliminating all matters of definition and distinction, it is obvious we think that Saunders was in common and everyday parlance an "insurance agent," and as such plaintiff in error was his principal. That he was not a "servant," within the usual significance of that term, seems to be obvious. See American Savings Life Insurance Company v. Riplinger, 249 Ky., 8, 60 S. W. (2d) 115. Therefore, in considering the liability of plaintiff in error for the tortious acts

of Saunders, we must apply the principle governing in such matters where the relationship or principal and agent is involved, and as particularly applicable in cases of this special class.

In Section 250 of the Restatement of Law of Agency by the American Law Institute, it is said:

"Except as stated in section 251, a principal is not liable for physical harm caused by the negligent physical conduct of an agent, who is not a servant, during the performance of the principal's business, unless the act was done in the manner directed or authorized by the principal or the result was one intended or authorized by the principal.

"Comment:

"(a) A principal employing another to achieve a result but not controlling nor having the right to control the details of his *physical movements* is not responsible for incidental negligence while such person is conducting the authorized transaction. Thus, the principal is not liable for the negligent physical conduct of an attorney, a broker, a factor, or a rental agent, as such. In their movements and their control of physical forces, they are in the relation of independent contractors to the principal. It is only when to the relationship of principal and agent there is added that right to control *physical details as to the manner of performance* which is characteristic of the relationship of master and servant, that the person in whose service the act is done becomes subject to liability for the physical conduct of the actor." (Emphasis ours)

This statement of the law is adopted by the court as applicable to these cases. The exceptions enumerated in Section 251 have no application here.

■ We are brought, therefore, to the precise inquiry as to whether or not in this instance Saunders, in his capacity as agent, also occupied the further capacity of servant of the Insurance Company in the matter of operation of the automobile. It is settled that "the test of one's liability for the act or omission of his alleged servant in his right and power to direct and control his imputed agent in the performance of the *causal* act or omission at the very instant of the act or neglect." Putting the matter in a different way, it may be said that a master is liable for acts of his agent under the doctrine of respondeat superior only where the relationship of master and servant exists at the time and in respect to the very thing causing the injury and from which it arises. Trachtenberg v. Castillo, 257

S. W., 657; Leachman v. Belknap Hardware & Mfg. Co., 260 Ky., 123, 84 S. W. (2d) 46; Standard Oil Company v. Parkinson, 152 Fed., 681, and authorities cited in those cases. The Supreme Court of Tennessee has in several cases reiterated the language of Judge Lurton as follows: "In every case, the decisive question is, has the defendant the right to control, *in the given particular*, the conduct of the person doing the wrong." See Income Life Insurance Co. v. Mitchell, 168 Tenn., 471, 79 S. W. (2d) 572.

■ While in principle these cases are controlled by the decision in the case of National Cash Register Co. v. Rider, 24 S. W. (2d) 28, in which the opinion of the Commission of Appeals was adopted by the Supreme Court, yet counsel for defendants in error forcefully argue that these cases are distinguishable from that one, because the control which plaintiff in error had the right to exercise over Saunders extended to more details of the work than was exercised over Rider in the case mentioned. They in effect seek to show that the exercise of control over Saunders was such as to constitute him a servant. We are unable to agree with this contention. In our opinion, while there are numerous provisions in the contract which indicate control over Saunders, yet we think the control evidenced by such provisions related primarily to the contractual features of his employment, and to the attainment of ultimate results, and not to "physical details as to the manner of performance" of his movements while soliciting, collecting, attending meetings, etc. Falling short in this last particular, the control was not such as to create liability on the part of plaintiff in error for his negligent acts in the operation of his wife's automobile; although at the time he may have been engaged in the furtherance of the company's business. While there are decisions to the contrary, including one or more by the Courts of Civil Appeals of our State, yet the overwhelming weight of all recent decisions supports the foregoing statement. We cite only a portion of the leading similar cases which support the conclusion we have reached: National Cash Register Company v. Rider, 24 S. W. (2d) 28; Leachman v. Belknap Hardware & Mfg Co., 260 Ky., 123, 84 S. W. (2d) 46; Income Life Insurance Company v. Mitchell, 168 Tenn., 471, 79 S. W. (2d) 572; American Savings Life Insurance Company v. Riplinger; 249 Ky., 8, 60 S. W. (2d) 115; Manus v. Kansas City Distributing Corporation, 228 Mo. App., 905, 74 S. W. (2d) 506; Stockwell v. Morris, 46 Wyo., 1, 22 Pac. (2d) 189; Mitchell v. Maytag-

Pacific Company, 51 Pac. (2d) 393; Wesolowski v. John Hancock Mutual Life Insurance Company, 308 Pa., 117, 162 Atl., 166; McCarthy v. Souther, 137 Atl., 445; Ignatowitch v. McLaughlin, 262 N. W., 352; Kassela v. Hoseth, 217 Wisc., 115, 258 N. W., 340; Harrington v. Lee Mercantile Co., 97 Mont., 40, 33 Pac. (2d) 553; Nettleship v. Shipman, 161 Wash., 292, 296 Pac., 1056; Dohner v. Winfield Wholesale Grocery Company, 116 Kan., 237, 226 Pac., 767; McCraner v. Nunn, 129 Kan., 802, 284 Pac., 603; Barton v. Studebaker Corp., 46 Cal. App., 707, 189 Pac., 1025; Pyyny v. Loose-Wiles Biscuit Company, 253 Mass., 574, 149 N. E., 541; James v. Tobin-Sutton Company, 182 Wis., 36, 195 N. W., 848, 29 A. L. R., 457; Khoury v. Edison Electric Company, 265 Mass., 236, 164 N. E., 77, 60 A. L. R., 1159; Gall v. Detroit Journal Company, 191 Mich., 405, 158 N. W., 36, 19 A. L. R., 1164; Aldrich v. Tyler Grocery Company, 206 Ala., 138, 89 So., 289, 17 A. L. R., 617; Neece v. Lee, 129 Neb., 561, 262 N. W., 1.

It would be superfluous to quote from these decisions except to emphasize the controlling element of liability in such cases as these. This element consists in the fact that the agent or solicitor must be under the control of the principal as regards his physical movements in the performance of the contract in order to create liability upon the part of the principal for the agent's tortious acts. In the case of Ignatowitch v. McLaughlin, supra, the Supreme Court of North Carolina quoted with approval from a prior decision (State ex rel J. A. Sixaner Mfg. Co. v. Grimm, 217 Wis., 422, 259 N. W., 262) as follows:

"Counsel seem agreed that the most potent factor in determining whether one is an independent contractor or an agent is where the control of the details of the work lies. Badger Furniture Company v. Industrial Commission, 200 Wis., 127, 227 N. W., 288. From the above statement of facts it appears that the control of the details is in France. The respondent, in opposition to this view, relies on a paragraph of the contract as follows: 'All details covering your work are to be under our direction. You are to make sales only upon prices and terms which we shall fix,' and urges that it is the right to control the details, rather than the exercise of the right as a matter of fact, that determines the matter of control, and cites the Badger Furniture Co. Case, supra, in support of its contention. This argument loses its force from the fact that the statement as to right of control is made in immediate connection with the control of prices and terms and should be limited to that, as it clearly appears both from the contract and the

course of conduct that it was not intended to cover the *details of France's traveling either as to how or where he should travel*. The facts of this case make a clearer case of an independent contractor than those in the case of Kassela v. Hoseth (Wis.) 258 N. W., 340. Under that case and the authorities cited in the opinion therein we hold that France was not an agent of the relator in respect *to the operation of his automobile,* but an independent contractor, if he can be considered as a 'contractor' in any sense in that regard. The term 'independent contractor' is perhaps a misnomer as so applied. It would be more exact to say that no contractual relations whatever existed between France and the relator as to the operation of the automobile. Whether France was a 'contractor' or not his operation of the automobile was entirely 'independent' of the relator, and, this being so, the relator is not responsible for his conduct in operating it."

In the case of Wesolowski v. John Hancock Mutual Life Insurance Company, supra, the Supreme Court of Pennsylvania used this langue:

"In the case before us the defendant had no control over Adams' car. It was in no position to require him to use it, for the use of his car was no part of his contract of service. It could not direct him when, where, or how to drive his car. It had no more control of Adams' car in which he transported himself than it had of the shoes he used in walking from patron to patron. The employer was indifferent as to whether Adams walked, rode a bicycle, or operated a motorcar to reach the people with whom he transacted business. If Adams had chosen to walk from person to person with whom he had his employer's business to transact and in walking he had negligently knocked over and injured another pedestrian, it could not reasonably be contended that his employer should respond in damages for Adams' negligent pedestrianism. So to hold would be to construe the phrase 'respondeat superior' beyond its fundamental meaning and to carry its principle to absurd lengths and to consequences forbidden by every sound consideration of public policy."

In the case of Manus v. Kansas City Distributing Corporation, supra, the court quoted with approval from the case of McCarthy v. Souther, supra, a statement which has been quoted in several cases as follows:

"The decisive inquiry is whether the employer had any control over Souther in the management and operation of the latter's automobile. If the evidence leaves it doubtful whether

control and direction in respect to the details of the work is reserved, the question is to be resolved as one of fact. * * * Upon this issue there is no evidence whatever to show any such control. Souther owned the car and was entitled to its exclusive possession. So far as appears, his contract of employment gave his employer no right of direction for any use of the car by others, and he was to maintain and run it as his personal affair. The allowance made for expenses implied no right and no liability on the employer's part in respect to its maintenance and operation. No authority for the employer to direct Southern how to run the car is to be inferred from the relations between them, and the employer had no more charge or control over Souther's means and manner of transportation than if the travel had been by train. While the employer might assign the routes and times for Souther's trips with the car, it might not direct how the trips should be made, or how the car should be managed. The employer, having no right, if present, to direct Souther in the way he ran and used the car, is not liable for the way it was run and used. How the car was run was its affair only in the sense of its interest in the results obtained from proper operation, and that interest was no evidence of a right to run it, or to say in what way it should be run as to the details of operation. A directed verdict for the employer should have been ordered."

The opinion in the case of Stockwell v. Morris, supra, by the Supreme Court of Wyoming, appears to us to be unanswerable. It reviews practically all American cases falling in this class. It demonstrates clearly how the doctrine here announced as applicable to salesmen and insurance agents has developed as a departure from the rigid rule applicable in cases of master and servant. The court notes the importance of a recognition of the distinction between an ordinary servant and an agent, such as was Saunders in this instance, and concisely puts the question for ultimate decision as indicated by the emphasized portion of the following excerpt from the opinion:

"A servant is defined as a person employed to perform personal service for another in his affairs, and who, in respect to his physical movements in the performance of the service is subject to the other's control or right to control, while an agent is defined as a person who represents another in contractual negotiations or transactions akin thereto. The reason assigned for the importance of making the distinction is that an agent who is not at the same time acting as servant cannot ordinarily make his principal liable for incidental negligence in connec-

tion with the means incidentally employed to accomplish the work intrusted to his care. Draft 1, p. 8; draft 5, p. 30, 31; pp. 99, 100. See, also, 19 A. L. R., 253, note. We think that the distinction mentioned may be drawn with profit. The control, or right of control, over physical movements generally exists when a person performs personal service for another, unless he is an independent contractor. That is not true, or not nearly as true, in the case of an agent. Moreover, actual control is ordinarily more immediate in the case of a servant than in the case of an agent. There can be no doubt that a salesman, such as Morris was, is an agent. 19 A. L. R., 260, note. Of course, an agent may, as to some work performed for his principal, be a servant. But no personal service, not even the delivery of washing machines, is involved in this case, unless the driving of the automobile may be called such. And the gist of the controversy herein is as to whether the principal is liable for its agent's negligence *while engaged in a more or less necessary physical act which is incidental to the performance of his general duties, or, if we must use a special term, whether or not the agent, while engaged in that physical act, must be regarded in the nature of an independent contractor.*" (Emphasis ours)

After referring to certain cases which sought to give controlling effect to provisions of the contract which evidenced a right to control in contractual matters, as distinguished from control of the physical movements of the agent in the particular matter wherein the accident arose, the court said:

"In so far as these cases base the right of control on the fact that the employer had the right to direct the terms of the contract, they are opposed to the great weight of authority. If that test were correct, then there would be few, if any, cases involving the negligence by a salesman, in which the doctrine of liability of the master for the negligence of a servant would not be applicable. These cases treat the physical movements of the person employed as but a minor part or incident in the performance of the employment, when, as a matter of fact, it is the major factor so far as an automobile accident is concerned. The making of a contract, affected by an agent, would seem to be but the result which is sought. It is exactly during the time that the so-called minor part is performed when an accident with an automobile is apt to occur. It will not likely take place while the salesman is talking to a customer, trying to effect, or effecting, a sale. If, accordingly, the right of control is the test in connection with the question before us, and

the courts apparently agree that it is, then, it would seem, it ought to be directed to *that portion of the employment directly connected with the factor by reason of which liability is sought to be established.* It would not do, we think, to pursue the shadow, leaving the substance out of consideration." (Emphasis ours)

After a review of numerous other cases the court reached the conclusion that "the right of control of the physical movements—the automobile is the decisive inquiry." The court then concludes that in the absence of an express reservation in the contract of control in that regard, or a necessary implication of such right from all the provisions of the contract and the circumstances, there could be no liability on the part of the principal.

As pointed out in the statement of the case, the contract in this instance gave plaintiff in error no control over the manner and means adopted by Saunders in the performance of his work, and left him free to choose any mode of travel which might seem to him best. He owned no automobile, and was furnished none by the company, and only at times used his wife's car for transportation. Most frequently he went on foot or by other means. Tested by the principles above announced, we are inescapably driven to the conclusion that there was no control over him by plaintiff in error in the matter of physical movements in the accomplishment of his work, and consequently plaintiff in error was not liable for his negligent acts in operation of the automobile.

Counsel for defendants in error rely strongly upon the recent case of Texas Power & Light Company v. Denson, 125 Texas, 383, 81 S. W. (2d) 36, in which the opinion was adopted by the Supreme Court. That case is not authority here. It will be noted that in the opinion Deaton is referred to as an "employee" and "servant" of the Texas Power & Light Company several times. An examination of the record discloses that this was his true relation to the company. He was employed as a salesman and demonstrator, worked under the complete direction and control of the company's manager, and was paid a salary. The question of agency was not in the case. The decision turned upon the question of whether or not the company was liable for the negligence of Deaton, although acting as an employee and in the course of his regular employment, if he used his own automobile for that purpose. The facts of the present case obviously create an entirely different situation.

The judgments of the trial court and the Court of Civil Appeals are reversed and judgment is here rendered in favor of plaintiff in error.

Opinion adopted by the Supreme Court June 17, 1936.

Rehearing overruled November 12, 1936.