**ANDERSON–BERNEY BLDG. CO. v. LOWRY.**

No. 14103.

Court of Civil Appeals of Texas. Fort Worth.

June 21, 1940.

Rehearing Denied Oct. 4, 1940.

Marvin Simpson and Robert Harrison, both of Fort Worth, for appellant.

H. S. Lattimore, of Fort Worth, for appellee.

BROWN, Justice.

Appellee, R. E. Lowry, brought suit against appellant, Anderson-Berney Building Company, seeking to recover damages for personal injuries alleged to have been sustained by him in the defendant's building, at a time when he was doing a painting job for the defendant, and he alleged that one Countryman, who was the manager of defendant's building, "approached plaintiff in said building and unknown to plaintiff, who was at that time working and engaged in carrying out a contract with the defendant, and said Countryman struck plaintiff in the back and on the shoulder and in defiant tones, accompanying said blow, demanded of plaintiff why he did not get to work." He further alleged that Countryman is a man of huge stature, has been employed by the defendant for several years, "and he was well known to be a man who used physical violence upon those persons who are in the building of defendant and employees or contractors, or employees of contractors, and if not actually known, could have been easily ascertained, and would have been known by the exercise of ordinary care, and the act of the defendant in retaining an employee, the said Countryman, at the time the said plaintiff was in the building and on September 8th, 1938, was negligence and the proximate cause of the injury to plaintiff."

The defendant answered formally and specially that Countryman was only the building engineer and had no authority or control over the work in which the plaintiff was engaged, or over the plaintiff. That if Countryman did the act of which plaintiff makes complaint, it was not done in the performance of his duties, and same was done in excess of his authority and outside of the scope of his duties; and further that any such act, if done, was nothing more than playfulness on the part of Countryman, and was purely personal.

The defendant further pleaded that Lowry made application for Workmen's Compensation from the Insurance Company who carried such insurance for defendant, and that Lowry represented himself to be an employee of the defendant, and was paid compensation, and that he executed a release in which he released the insurance carrier and the defendant from all further liability for the alleged injuries; that plaintiff is estopped in this suit because of his prior acts.

To this answer the plaintiff pleaded:

"Whatever contracts or statements the plaintiff may have signed in connection with the Workmen's Compensation Insurance Company carried by the defendant were in fact only to comply with the request and instructions of the agent of said Workmen's Compensation Insurance Company and defendant, and the said agent was in fact informed by plaintiff that said statements were not true, and the said agent represented and agreed that it was understood that same were not true but were to be so recited in order that settlement with said Massachusetts Bonding & Insurance Company insofar only as any possible liability of it for workmen's compensation insurance might be carried out, which had been already agreed on, and was accomplished and binding prior to the time that such statements, if any, were made by the plaintiff, as pleaded by the defendant in its said answer, such agent being one Wehmeyer to whom this plaintiff was directed by the defendant to go, and settlement of Three Hundred ($300.-00) Dollars agreed on and paid by the Massachusetts Bonding and Insurance Company was only to relieve the said insurance company of any liability as carrier of workmen's compensation insurance under article 8306 et sequentia of the statutes of Texas, and was wholly inadequate compensation to this plaintiff for his injuries and was understood by the plaintiff and defendant to be inadequate and was only a settlement desired by the said Workmen's Compensation Insurance Company of any possible liability as such that might arise from a misconstruction of the facts of the case, and was offered by the said insurance company and accepted by this plaintiff with full understanding by all parties that this plaintiff did not claim to be an employee of the defendant, and there were no facts raising any issue of such relationship except that after the work was completed, during the course of which this plaintiff suffered the injuries complained of in this suit, the defendant refused to pay plaintiff the contract price which he had set and which had been agreed on, and instead paid plaintiff an amount equivalent to wages for the time employed, and refused to pay more although the plaintiff protested

and insisted that such payment was a breach of the contract made by plaintiff and defendant at the time the work was begun, and if in fact the said contracts signed in connection with the compromise with the Massachusetts Bonding and Insurance Company have any legal right on their face other than as herein pleaded, then same were a fraud perpetrated upon this plaintiff by the said defendant and the said Massachusetts Bonding and Insurance Company and their agents, the said Douglas and Wehmeyer, who induced the plaintiff to believe the facts to be as hereinabove pleaded and represented same to be so, and induced this plaintiff to sign said instruments believing same to have no other effect than as above pleaded, and this plaintiff would not have signed same if he had not been so informed and had not so believed.

"Wherefore, plaintiff prays as in his original petition."

At the close of taking testimony, the defendant requested a peremptory instruction, which was refused.

The cause was submitted to the jury on special issues and the following findings were made: (1) That plaintiff was an independent contractor when he fell, (2) "that the act of the defendant's employee, Countryman, in causing the plaintiff to fall on the occasion in question, was negligence on the part of the said Countryman", (3) such negligence was a proximate cause of plaintiff's falling, (4) "that Countryman, in causing the plaintiff to fall on the occasion in question, was acting within the scope of his employment", (5) "that at and prior to the time of the plaintiff's falling on the occasion in question that Countryman was in the habit of using physical violence upon persons who were employees or contractors of the defendant", (6) this habit was known to the defendant, (7) that defendant was negligent in retaining Countryman in its employ, (8) such negligence was a proximate cause of plaintiff's falling, (9) plaintiff sustained an injury to his hip at the time he fell on the occasion in question, (10) his damages were fixed at $13,000.

In answer to the only defensive issue given by the trial court and requested, the jury found, "that in causing the plaintiff to fall on the occasion of the accident Countryman was not acting in playfulness and that his action was not personal as distinguished from the performance of the duties which he was engaged by the defendant to perform."

Judgment was rendered for plaintiff, hence the appeal.

Taking the view that we do of this record, we shall not discuss all of the questions laid before us, but our conclusions will be bottomed on a few controlling issues. There is nothing new in those not discussed and we pretermit discussion of such.

We shall not attempt to discuss the assignments of error in their order as presented.

■ Special Issue No. 5, submitted over the objections of defendant, is: "Do you find from a preponderance of the evidence that at and prior to the time of the plaintiff's falling on the occasion in question that Countryman was in the habit of using physical violence upon persons who were employees or contractors of the defendant?"

The objection urged against this issue is, "that this issue is irrelevant and has no proper part in this case and tends to confuse the jury, and to put into their minds for consideration a question which is not relevant or pertinent, to the defendant's detriment and injury."

The further objection was made, "that there is no sufficient evidence in the record to warrant the submission" of such issue.

These objections are brought before us in assignments of error Nos. 25 and 28, respectively. We believe both assignments of error are well taken.

It is impossible to escape the conclusion that plaintiff intended by his averments to plead that Countryman committed an assault upon him, accompanied by words and tones exhibiting defiance. "Defiant" means full of defiance, and "defiance" means "provoking to combat—a challenge —a declaration of hostilities."

"Violence" is force, physical force; force unlawfully exercised. Bouvier, in his Law Dictionary, 2 Bouv.Law Dict., Rawle's Third Revision, p. 3402, defines "violence" as: "The abuse of force. That force which is employed against common right, against the laws, and against public liberty."

We have read the Statement of Facts, and we cannot find evidence to support

said Issue No. 5. The most that can be said of the testimony in its entirety is that Countryman pranked or played with some of the persons who were employed by or engaged to do work for the defendant.

The record is devoid of any testimony tending to prove that Countryman exhibited ill will toward the employees or persons working for the defendant, or ever struck, or used violence on them, under circumstances which evidenced a display of anger or ill will.

Plaintiff's suit is not bottomed on the theory that Countryman is a very large man who, while on duty and during business hours, plays roughly with other employees and persons engaged by the defendant to work on the premises, and, because of his great strength and peculiar propensity, injures and hurts such persons, and that this was known to the defendant, who negligently kept him in its employ, knowing that these other employees and persons were subjected to his rough handling and thus daily faced probable injury at his hands.

No such case is presented or attempted to be presented.

■ It cannot be said that the submission of this irrelevant issue, unsupported by testimony, was not harmful to the defendant.

The act of the court in submitting the issue is tantamount to advising the jury that the evidence on such issue is sufficient to require its submission, and the finding by the jury that the issue in fact exists, when the evidence does not support it, compels a reversal of the cause.

We will next consider the assignment of error which attacks the finding by the jury, in answer to Issue No. 4, that Countryman in causing plaintiff to fall was acting within the scope of his employment.

The issue is: "Do you find from a preponderance of the evidence that Countryman in causing the plaintiff to fall on the occasion in question was acting within the scope of his employment, as that term is defined for you in paragraph IV above?"

The defendant's assignment of error urges that: "The finding of the jury to special issue No. 4 was contrary to the overwhelming preponderance of the testimony, and was unsupported by the testimony, in that the uncontradicted testimony shows that Countryman was not acting within the scope of his employment, and was not engaged in the furtherance of any of the duties which he was employed to perform, at the time of causing the plaintiff to fall; but shows, to the contrary, overwhelmingly and convincingly, that Countryman's act which overbalanced the plaintiff and caused him to topple over, was nothing more than a crude instance of pranking and playfulness."

This is presented by the 29th assignment of error.

The court instructed the jury: "An employee is acting within the scope of his employment when he is engaged in doing, for his master, either the act consciously and specifically directed, or an act which can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of the act or a natural, direct and logical result of it."

Such is the guide given the jury for their consideration in arriving at an answer, from a preponderance of the evidence.

■ In the first place, there is no testimony even· tending to show that, at the time Countryman slapped the plaintiff on the back, or shoved him, causing plaintiff to fall, Countryman was "engaged in doing, for his master, the act consciously or specifically directed" to be done by the master.

To support such theory, it was necessary to show that the employer had given Countryman supervision and control over the work in which plaintiff was then engaged.

The evidence does not support such theory. The best that can be said of such evidence as was adduced is, that, on occasions, ·the manager in charge of the building (who made the contract with plaintiff) sent messages by Countryman to Lowry and to other persons employed on the premises, concerning their work, and was, by the manager, given odd jobs to do about the premises.

All this testimony, considered carefully, does not support the issue of Countryman being engaged in the performance of his duties as an employee when he slapped plaintiff on the back and said what plaintiff asserts he said when he did the act complained about. No evidence tends to show that Countryman was sent to deliver any message to Lowry, and the evidence fails to show that Countryman had any

control over Lowry or any supervision over Lowry's work.

The testimony fully evidences the fact that Countryman and Lowry were on friendly terms. No animosity or ill will is shown by the testimony.

Lowry testified that he had a man employed to do the painting in defendant's building and was standing talking to this man and pointing with one hand, and, "While my hand was up, I was showing him where there was some spots up there, why, I got a terrible shoving and blow on my shoulder, with a yell at me, 'Why don't you get to work?' And by that time I had done went into a twist or a fall to the concrete floor * * *. I was in such great pain, and I looked up to see, and it was Mr. Countryman that knocked me down, and he walked over and put his hands down and took hold of my hand and gave me a pull, and I came up * * * and I said, 'What do you mean?' And he said, 'What do you mean?' something like that, or something of that kind, and I turned and hobbled off."

On cross-examination, he admitted that he and Countryman had always been on friendly terms, and speaking of the incident the following testimony appears:

"Q. Now when Countryman came into the room there and shoved you, as you put it, isn't it a fact that he was just joking with you? A. No, sir; I could not take it that way.

"Q. You do not know of any reason why he would be trying to hurt you, do you? A. Yes, sir.

"Q. What was it? A. He might, to hurry me up to get that painting on the wall done, and to get the job done.

"Q. He was not mad at you, you say, about anything? A. Well, it looked like he was. It looked like he was irritated about something.

"Q. Nothing had happened, though, between you and him prior to that time that would make him mad, at that time? A. I don't recall anything at that time."

Soon after the accident, Lowry wrote a letter to Mr. Anderson, telling how and what happened, and said: "Said he was in fun but this is what his fun has done for me."

Lowry also made a statement in writing in connection with his claim for compensation, in which he said, speaking of Countryman's actions and words: "He

told me to get out of his way and to let him go to work. He told me that he was joking me at the time he shoved me. He helped me to my feet, and I told him then that I was easily overbalanced. He shoved me pretty hard when I fell to the floor."

Lowry, attempting to explain away his statements, said that he intended to say that Countryman told someone else that he was only joking at the time.

The undisputed record, from the lips of Lowry, discloses that there was but little to be done on the job, and that it required about an hour and a half to complete it. It is also undisputed that the premises were not to be occupied by the tenant for some days to come. This evidence utterly destroys Lowry's theory—his only theory—of the reason for Countryman's acts and words, viz., that he wanted the work speeded up.

It thus appears that the evidence does not support the theory that Countryman bore any ill will against Lowry, or that he assaulted or intended to assault Lowry at the time, and we do not believe that the facts shown support any theory upon which Lowry can recover damages from the appellant, even if the facts were strong enough to support a verdict that Countryman was acting within the scope of his employment at the time; and we hold that the evidence does not support such an issue.

We will next discuss the latter part of the definition of "scope of employment."

The evidence not being such as that it supports the theory that Countryman was engaged in doing, for his master, the act consciously and specifically directed, by the master, it is next necessary to inquire whether the act done by Countryman can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of the act which was consciously and specifically directed by the master, or that such was the natural, direct and logical result of it. The evidence does not tend to support such theory.

Even if the master had directed Countryman to supervise the work being done by Lowry, or if the evidence disclosed that Countryman had any such supervision by reason of the duties imposed upon him by his employment, it could not be said that the specific act complained about can fairly and reasonably be deemed to be an

ordinary and natural incident or attribute of the duty resting upon Countryman, or a natural, direct and logical result of the performance of such duty.

Volume 29, Tex.Juri., para. 251, pp. 423, 424, says:

"On the other hand, if the occasion is not one for the use of force, or if the force used is in excess of what is justifiable, the master is liable for the assault where he has placed his servant in an employment which requires the exercise of discretion as to whether the occasion is a proper one for using force and as to the amount to be used.

"But where the person assaulted had done nothing which could justify the use of any force whatsoever, and it further appears that the servant committed the assault to satisfy a personal grudge, then no liability attaches to the master."

The assignment of error is sustained.

The thirty-fifth assignment of error complains of the trial court refusing to instruct the jury peremptorily to find for appellant.

We believe that, under this record, such assigned error should be sustained.

The Supreme Court, speaking through the Commission of Appeals, in American Nat. Ins. Co. v. Denke et al., 128 Tex. 229, 95 S.W.2d 370, 373, 107 A.L.R. 409, said: "Putting the matter in a different way, it may be said that a master is liable for acts of his agent under the doctrine of respondeat superior only where the relationship of master and servant exists at the time and in respect to the very thing causing the injury and from which it arises."

In support of the opinion, a number of cases are cited, among them being Leachman v. Belknap Hardware & Mfg. Co., 260 Ky. 123, 84 S.W.2d 46, 48, wherein this language is used: "The test is whether there was authority for doing the act causing the injury."

Applying this doctrine to the instant suit, we ask: Even if the master gave supervisory authority over Lowry to Countryman to watch over the work as it was being done by this independent contractor and to urge him to expedite the work, can it be said that the master authorized Countryman to do the act that caused the injury? Can it be said that the act was an ordinary and natural incident or attribute of the supervisory authority given to the servant, or that it was a natural, direct and logical result of such authority? We do not believe so.

The master did not nor could he be said to have the duty to anticipate that his servant would do the act that actually caused the injury.

As said heretofore, we pretermit passing upon the assignments of error not discussed.

The judgment of the trial court is reversed and judgment is rendered for appellant.