### FORD et ux. v. PHILLIPS et al.
### No. 4783.

Court of Civil Appeals of Texas. Beaumont.
July 11, 1952.

John T. Lindsey, Port Arthur, for appellants.

Orgain, Bell & Tucker, Beaumont, for appellees.

WALKER Justice.

Appellants Wayne R. Ford and wife, Mary Bell Ford, brought this action against appellees W. M. Phillips and the American National Life Insurance Company to recover damages for the death of their son, James Wayne Ford, an infant, whom the defendant Phillips killed on October 17, 1950, by driving his automobile over the infant's head. Plaintiffs' cause of action was based on various allegations of negligence, charged to have been committed

by Phillips in the operation of his automobile. The cause was tried to a jury and the trial court instructed the jury to return a verdict against the plaintiffs, and on this verdict rendered judgment against plaintiffs. From this judgment the plaintiffs have appealed.

Under Points 3, 4 and 7 plaintiffs have assigned as error that there was evidence of negligence by Phillips in striking the infant on the "shoulder" of the central driveway or street referred to hereinafter, in not having his vehicle under proper control, and in failing to drive his car on "his proper righthand side" of the road. These Points are overruled.

Under Points 1 and 2, the plaintiffs assign as error that there was negligence by Phillips in not keeping a proper lookout for the infant and in not seeing the infant at a time when he could have avoided the infant's person. There was evidence of the following matters, relevant to these points:

At the time of the incident the infant, James Wayne Ford, was three years and four months old, and resided with the plaintiffs, his parents, at one of the dwellings in Parker's Court which the plaintiffs occupied as tenants of C. G. Parker, the owner of the Court. There were 15 of these dwellings and a garage, with an upper apartment, in the Court, and outside or partly outside of the Court was a building which housed a store. The Court adjoined a public highway; and the various buildings in the Court were arranged in the shape of the letter "U", with a roadway at the center, which led into the highway. At the entrance of the Court there was a cattle guard across this central driveway and at the other end of the driveway was Parker's dwelling. Nine of the houses were on the right side of the central drive, looking from the cattle guard towards Parker's house, and the other houses were on the opposite side. All of the dwellings faced the central drive.

The entire Court, structures and driveway, occupied a relatively small area.

According to Parker, the central drive was 50 feet wide and the plaintiffs' house was 20 feet from the boundary of the drive. There is some apparent contradictory testimony, but we construe it as referring to the traveled part of the drive. According to this testimony, the traveled part of the drive was about 35 feet wide and the plaintiffs' house was about 30 feet from the nearest edge. A shallow drain, with gently sloping sides, extended along the central drive, between the drive and the yards of the plaintiffs and their neighbors. Between the drain and the traveled part of the drive was a "shoulder" on which grass grew; but there was sand in and about the drain near the plaintiffs' house.

The plaintiffs resided in house No. 7, which was the fourth house from the cattle guard. Next to them (looking towards Parker's) was house No. 8 and beyond that, house No. 9. A family named Carruth resided in house No. 9.

No trees were in front of the plaintiffs' house but before house No. 8 and beyond it, between it and house No. 9, was a clump of trees which Parker said numbered 9 or 10. Two of these (shown in defendants' exhibits 3 and 4) stood only 2 or 3 feet from the traveled part of the road; these trees stood at a point which lay perhaps between an extension of the walls of houses 9 and 8, but which according to defendants' exhibit 4 seem nearer an extension of the farther wall of house No. 8. Two others of these trees stood much nearer the plaintiffs' house, but much farther from the road. The plaintiff W. R. Ford, on his second examination, after having made additional measurements, said that these two groups of trees were about 30 or 35 feet apart and on his first examination he estimated the distance from the street of the two trees nearest the plaintiffs' house at about 15 or 20 feet. According to defendants' exhibit 2, one of these two trees stood near the corner of house No. 8 nearest the plaintiffs' house and well up in the yard of house No. 8, and this was the tree nearest plaintiffs' house. On his second examination the plaintiff W. R. Ford said that the two trees farthest from his house and nearest the central drive were about 80 feet from his house and on his first examination said

that the trees nearest his house were about 30 or 35 feet from his house. There seems to be some inconsistency between his estimates of the distance which the nearest trees stood from his house but defendants' exhibit 2 shows the relative location of these trees and defendants' exhibit 3 shows the relative location of the trees farthest from plaintiffs' house. There was a good deal of other testimony respecting the location of the various trees and houses but this statement sufficiently indicates the relative position of the two groups of trees, the central drive, and the adjacent houses.

There was nothing to obstruct a motorist's view of the central drive, the shoulder, the drain and the adjacent yards as he approached the plaintiffs' house from the cattle guard.

The incident occurred about 4 o'clock on the afternoon of October 17, 1950, and the sun was shining brightly at this time. The ground was dry.

According to the testimony of Mrs. Ford, she was standing on the porch of her house immediately prior to the occurrence of the incident. She saw the defendant Phillips' car entering the Court, at a point which she estimated to be about 15 or 20 feet from the cattle guard, moving then at a speed which she estimated to be 15 or 20 miles per hour. Her son James Wayne Ford was playing in the sand on the shoulder of the central drive with a bucket and shovel at a place which Mrs. Ford said was "just angling" toward the right from where she stood and about 30 or 35 feet away. This placed the infant between the drain and the traveled part of the road; and the plaintiffs' exhibits 3 and 4, which show the place where Mrs. Ford located the baby confirm this. There was no evidence locating more precisely the exact spot at which the infant was playing. Defendants' exhibit 2, as well as the plaintiffs' exhibits 3 and 4, show however, about where Mrs. Ford thought that the infant was at the time. There are inconsistencies and uncertainties in Mrs. Ford's testimony but this statement sufficiently indicates the position of the child, and with the evidence previously summarized, shows that when Mrs. Ford saw the child at play, the child was in plain view of Phillips as Phillips approached the plaintiffs' house.

Mrs. Ford said that when she first saw Phillips he was looking to his left, toward a person at the back of the store (which stood at the left of the cattle guard), but that he turned his car toward the right of the drive as if he intended to stop at the second house from the cattle guard, and that he drove along the right side of the road. She then looked toward her son and saw him at the place mentioned above. She then turned to get a cloth off a dresser inside her house but near the door, and while she was doing this she heard the defendant Phillips call out, and upon turning around saw Phillips at a point up in the yard, apparently between an extension of the walls of house No. 8 and plaintiffs' house, holding her son.

Mrs. Ford did not see the incident and no one else did except, perhaps, a person named Badeau who did not testify. However, some testimony of the defendant Phillips tends to prove that Badeau's back was turned when the incident occurred.

Mrs. Ford said that only "a matter of seconds" elapsed between the time she first saw Phillips near the cattle guard and the time she saw him holding her son. On a deposition taken before trial she had referred to this as a minute or two. Her testimony concerning this interval of time was, of course, indefinite but a jury could construe it as indicating a very short lapse of time.

Mrs. Ford gave evidence locating the place where Phillips' car stopped, and this place is shown by the plaintiffs' exhibits 2, 3 and 4, as well as defendants' exhibit 2, which also shows the relative positions of the child before the collision and of the car afterward. According to these photographs and other testimony of Mrs. Ford, Phillips stopped only a few feet from the place where she saw her son playing, with the right wheels upon the shoulder of the drive but with most of the car standing on the traveled part of the driveway. L. O. Ford said that the car was "right at the shoulder. Right on the shoulder." Mrs. Ford placed the front bumper of Phillips' car about even with the tree nearest her house, and plain-

tiffs' exhibits are in accord, as are Mrs. Ford's marks on defendants' exhibit 2. L. O. Ford gave testimony indicating that the car was farther away from the plaintiffs' house. He said that "it was, I believe, on up a little further than this car here. Right beside the trees—between the trees and the road." His testimony is not entirely clear but we construe the language quoted as referring to the two trees nearest the plaintiffs' house and not to the two trees between houses 8 and 9. This testimony of L. O. Ford's was called to Mrs. Ford's attention but she adhered to her testimony which placed Phillips' car between her house and the two trees nearest her house. She said: " * * * but it was still sitting there where * * * on this side of the tree." And on redirect examination she said that the car "certainly was" at approximately the right place, that is, the place where she had said that it stopped.

The defendant Phillips was an agent for the defendant American National Insurance Company and he had come into the Court to collect an insurance premium from the Carruths. He had been in the Court many times and was familiar with it and he knew where the Carruths lived. He said that he was driving a new Chevrolet automobile, with good brakes, but the record contains no other information about this vehicle.

According to Phillips his car came to a stop after he crossed the cattle guard, because passage over the guard was rough; and as he did this he saw a person at his left (as Mrs. Ford had testified) and he spoke to this person and then proceeded down the central drive towards the Carruths' house.

He testified that he kept a lookout as he moved forward and this lookout would have revealed the child's presence beside the drive if the child had actually been in the open.

However, he never saw the child until after he left his vehicle, and this was after the infant had been injured.

His testimony shows that he heard the child cry twice, the first time not so loudly, but the second cry was a scream, and at this moment he felt the right rear wheel go up in the air as if it had passed over a root. He felt nothing at the time of the first cry and there is evidence that he gave no heed to this cry. Immediately after hearing the scream and feeling the movement upward of the wheel of his car he brought the car to a stop; but his car had been moving until that moment.

Since the child cried twice it is evident that the car struck the child twice, and it appears that Phillips was attempting to take up an account book which he needed to transact his business with the Carruths; at least when he struck the child the second time.

Because of the importance of Phillips' testimony summarized in the last two paragraphs, we quote it in full. Phillips said that he stopped his car, not at the tree nearest the Fords' house where Mrs. Ford and L. O. Ford had placed it, but at the two trees farther away from the plaintiffs' house, near the road, and since this evidence is not material to the point at issue we have omitted it and other inconsistencies with the plaintiffs' proof to which it led.

Phillips said: (1) "A. Well, I drove up there, and I *started to stop, and I heard a child cry. I didn't pay no attention to it. I reached to get my book and get out of the car, and opened the door,* and I heard a real scream, a child scream, and I dropped my book and run around the right side of my car and the child was laying there, and I reached down and picked the child up and commenced hollering for help."

(2) "A. Well, I would say he was right at—Oh, I guess between the back bumper and the middle of the wheel, about that far from the car. (Indicating)

"Q. To the right of the car? A. Yes.

"Q. Nearer to the car? A. I will say just about like that (indicating) from the rear bumper, just laying there.

"Q. What speed were you going when you struck this child? A. Well, I already had my switch off, fixing to

stop, you see. I would guess I was going five or six, maybe eight miles an hour. Something like that.

"Q. How far was the child's body carried from the point of contact? A. Well, when I felt the uprise in the back of the tire, I stopped. I thought it felt like that I was hitting a root. I didn't know what it was.

"Q. The question I asked was this. Do you know how far the child's body was carried from the point of impact; how far you knocked the child's body? A. I don't think it moved. I think it run into the side of the car.

"Q. The wheels passed over the body? A. Bumped it's face, I believe, or I wouldn't have felt the uprise." ·

(3) "Q. How far did you travel, after you struck the child? A. Well, the best I can remember, I can't think I went over two feet, is the best I can remember.

"Q. How do you arrive at that distance? A. Just as soon as I figured I hit the child, or the child hit the car, when that uprise came, and I stopped.

"Q. Didn't you testify here in your deposition last Friday, that you didn't know you had struck the child? A. Well, I did not. I didn't know I had struck the child until the child cried, the second time, and that's when I opened the door."

(4) "Q. I believe you have already answered this. How far did your car travel after you struck this object, you didn't know what you had hit, until you got out? A. Oh, I guess two feet. I don't know. I just————."

(5) "Q. Just as you were coming to a stop, did you feel any unusual movement of your car? A. I felt a little uprise, I figured, in the back right wheel.

"Q. In the back right wheel? A. Back end, or something, on the right side there, and I stopped.

"Q. In your mind did you or not have some thought of what that might have been, at that time? A. I figured it was a stump there.

"Q. From that sweet gum tree? A. that's right.

"Q. You were close enough to it, to where you figured that might have been what it was? A. Yes.

"Q. As you drove up that day, was this child out in the open, where you could see it? A. I never seen it.

"Mr. Lindsey: If the court please, we object to it, because he has testified he didn't see the child.

"The Court: Overruled.

"Mr. Lindsey: Note our exception.

"The Court: Answer the question. Was the child out in the open where you could see it?

"A. No, sir; I didn't see the child.

"Q. Were you keeping a lookout ahead of you? A. Yes, sir.

"Q. Were you, in keeping such a lookout—were you or not keeping such a lookout that you would have seen the child if it had been in the open? A. Yes, sir.

"Q. You never did see the child until after you had gotten out of the car? A. That's right. I didn't ever.

"Q. Did the front part of your car strike the child at that place? A. Just like I say, I don't—I don't think it did. The back wheel did. I didn't feel the front part of the car go up at all.

"Q. Did you feel a bump on the right back wheel? A. Back wheel.

"Q. And you felt nothing in the front part? A. That's right.

"Q. Now, after you felt that bump, what did you do then? A. Well, I stopped and I reached and got my book. *Before that, though, I heard a cry, and looked around and didn't see anything, and I reached in and got my book and opened the door, and I heard a scream. And I knocked open that door and I dropped the book and run around to see what it was, and it was a child.*

"Q. You have already testified that it was right close to the right rear wheel? A. That's right."

(6) "Q. Now, at the time you felt this bump, were you or not at that time already coming to a stop. A. Yes. I was practically to a stop then. I had already had my switches off."

(7) "Q. Whereabouts—Then your car rolled, naturally, a good bit after you struck the child?

"A. No. It stopped right then.

"Q. Do you mean to say— A. I could have went, say, two feet, or something like that.

"Q. Now, if that is the point where you car struck the child—that pen mark on the picture—is that where the child was when you hit him? A. Well, I never seen the child. That's the trouble. I don't know the exact answer to that question; can't answer it intelligently. I don't know where the child was."

(8) "Q. You got out on the left side? A. That's right.

"Q. The side the trees were on? A. That's right.

"Q. And came around the back of the car? A. That's right.

"Q. Where was the child lying then, with reference to the car, when you got out? A. Well, I would say approximately eight or ten inches from the back bumper on the righthand side of the car.

"Q. Eight or ten inches from the rear bumper? A. Yes from the hubcap to the rear bumper."

Points 1 and 2 are sustained for these reasons:

■■ (a) Defendant Phillips was bound to keep a lookout for the child on the shoulder of the road and this duty was not merely one to look ahead but was also one to view the scene laterally, so as to avoid striking persons at places toward which Phillips turned his car. Cobb Brick Co. v. Lindsay, Tex.Civ.App., 277 S.W. 1107, 2 S.W.2d 1010; Beaumont–Port Arthur Bus Lines v. Williford, Tex.Civ.App., 100 S.W.2d 432; Hirrell v. Lacey, 274 Mass. 431, 174 N E. 679; Lackey v. Gulf C. & S. F. Ry. Co., 225 S.W.2d 630; D'Ambrosia v. Brest, 302 Mass. 316, 19 N.E.2d 53. Phillips was not on a public highway or street; he was on the central driveway of a group of apartments located in a compact and relatively small area inhabited by a number of people. He was familiar with the scene and with the Court and could at least have reasonably expected other persons to be near the traveled part of the central drive and on the shoulder of the drive where he stopped his car.

■ (b) The shoulder of the road where Mrs. Ford saw her child at play and where Phillips' car was stopped was in the plain view of Phillips as he approached this place over a distance of about 200 feet. The sun was shining and *if the child was actually on the shoulder* when Phillips arrived at the place where Mrs. Ford's testimony located the child then Phillips ought in the exercise of due care to have seen the child and have avoided the child if he had been keeping the kind of lookout required of him. A failure to see a person in plain view as the motorist approaches the place where that person is shows a breach of the duty to keep a lookout. In addition to the decisions cited, see: Esparza v. El Paso, Tex.Civ.App., 296 S.W. 979; Texas Consol. Theaters v. Mauldin, Tex.Civ.App., 152 S.W.2d 930; Standard Paving Co. v. Webb, Tex.Civ.App., 118 S.W.2d 456. Regarding circumstantial proof, see especially D'Ambrosia v. Brest, 302 Mass. 316, 19 N.E.2d 53. The jury were not required to believe Phillips' statement that he looked and that he did not see the child; the circumstance mentioned is affirmative proof that he did not look.

(c) The question then, is whether the child remained upon the shoulder of the road at or near the place where Mrs. Ford saw him playing. There is no direct evidence pertaining to this question but the following circumstances (and the fact, of course, could be proved by circumstantial evidence) raised the issue for the jury that the child did remain at least near the place where Mrs. Ford last saw him at play. (1) The child was actually upon the shoulder of the road not only when Mrs. Ford first saw him but also when Phillips found him; and according to the evidence of Mrs. Ford,

which was sufficient to raise an issue for the jury, the distance separating these two places was only a few feet. How many feet this distance actually covered the evidence does not show, but the distance was a very short one according to Mrs. Ford's testimony. (2) The interval between the time Mrs. Ford saw the child at play and the time she next saw the child, in Phillips' arms, was very short. She described it as "a matter of seconds." (3) When Mrs. Ford saw him upon the shoulder of the road, the child was engaged in play, and his occupation was calculated to hold his attention and to keep him at or about the place where Mrs. Ford saw him. He was playing in the sand with his bucket and shovel. No distracting influence, such as another child, is in proof; and the nearest trees were at least not close by him. (4) There is an explanation for the child actually having moved a short distance from the place where his mother saw him playing. Phillips heard the child cry twice. The jury could reasonably infer that the first cry was caused by the car, evidently some light contact with the right front part of the car of which Phillips, sitting within the car at the wheel, was not conscious, and that this resulted in some movement which actually caused the child not only to move but also to come into such a position that the right rear wheel passed over his head. Phillips' testimony indicates that no other part of the child's body ever came beneath the car. He said that he found the child between the bumper and the mud guard toward the right of the car. This position is inconsistent with any part of the child's body except his head having been under the car.

(B) We refer to the following arguments and statements by the defendants:

1. Defendants emphasize Mrs. Ford's testimony about Phillips' position when Mrs. Ford first saw him with the child after the car struck the child. According to her, Phillips was up in the yard, several feet away from the car; but this circumstance proves nothing in defendants' favor. Phillips found the child very near his own car and he might very well have moved from there to the place where Mrs. Ford saw him. There is no reason why Phillips should have moved to that place from the trees some 30 feet away near which he said he stopped his car.

2. There are inconsistencies in Mrs. Ford's testimony and in the testimony of other witnesses but these were for the jury. Mrs. Ford's estimates of distances were supplemented by photographs marking the various significant places and locations by physical objects and by marks made upon the photographs. The argument based on the distance from plaintiffs' house to the trees nearest that house is not convincing. There is no proof showing exactly how far the child was from these trees when Mrs. Ford first saw him. This distance can only be inferred, as we have previously indicated. The argument does not take into account the length of Phillips' car nor does it take into account the effect which the car itself evidently had upon the child's movement away from the very place where Mrs. Ford saw him playing. Furthermore, it is no defense that the child did move if he did remain upon the shoulder, because the shoulder was in plain view of Phillips. There is nothing in the proof to indicate that the child ran from behind the trees and into Phillips' car. The way and manner in which he was hurt and Phillips' testimony showing that the child cried twice are inconsistent with this theory.

█ Point 8 assigns error to the instruction of a verdict in behalf of the defendant American National Insurance Company, but this point is overruled. Phillips was an agent for this defendant and he was on his way to the home of the Carruths to collect a premium accruing on a policy issued by the insurance company. However, he did not injure the child while he was actually performing the insurance company's business. Instead, he injured the child immediately before he stopped his car, that is, on his way to the home of the Carruths. The car belonged to him and there is no evidence that the insurance company knew of Phillips' use of his own automobile or that the insurance company had authorized him to use his own automobile. Further, he

exercised control over his manner of doing his work. On these facts, the case seems to be ruled by Kennedy v. American National Ins. Co., 130 Tex. 155, 107 S.W.2d 364, 111 A.L.R. 916; American National Ins. Co. v. Denke, 128 Tex. 229, 95 S.W.2d 370, 107 A.L.R. 409, and Burt v. Lochausen, Tex., 249 S.W.2d 194.

Appellants' Points of Error Nos. 4 and 5 assign error to the exclusion of certain testimony. However, these points are overruled on the merits, both because the record fails to show what the testimony would have been and also because the record does not demonstrate that the exclusion of this evidence was materially harmful to the appellants.

The judgment of the trial court is affirmed as to the defendant American National Insurance Company. As to the defendant W. M. Phillips, the judgment of the trial court is reversed and the cause against said defendant is remanded to the trial court for further proceedings.